# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

No. 06-6048MN

|  |  |  |
|---|---|---|
| In re: | * | |
| | * | |
| Alex and Chanhsamone | * | |
| Phongsisattanak, | * | |
| | * | |
| Debtors. | * | |
| | * | |
| | * | Appeal from the United States |
| Alex and Chanhsamone | * | Bankruptcy Court for the |
| Phongsisattanak, | * | District of Minnesota |
| | * | |
| Plaintiffs -Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Blue Heron, Inc., | * | |
| Mark Erjavec, | * | |
| John Doe, | * | |
| | * | |
| Defendants-Appellees. | * | |
| | * | |

Submitted:  September 13, 2006
Filed: October 13, 2006

Before FEDERMAN, MAHONEY, and McDONALD,  Bankruptcy Judges.

MAHONEY, Bankruptcy Judge.

This is an appeal from a decision of the bankruptcy court[1] which determined that a real estate transaction entered into between the debtors and Blue Heron, Inc., was not a fraudulent conveyance under Minnesota law because the debtors were not insolvent at the time of the transaction and were not made insolvent as a result of the transaction. The debtors, operating as debtors in possession in a Chapter 11 case, brought this action, in part, to avoid the real estate transaction by the exercise of the avoidance powers provided to debtors in possession by 11 U.S.C. § 544. In the bankruptcy court, the debtors also argued that there had been a violation of the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69), and that there had been a breach of contract. Those arguments were abandoned on appeal.

We affirm the decision of the bankruptcy court.

## STANDARD OF REVIEW

The bankruptcy court's factual findings are reviewed for clear error and its conclusions of law are reviewed *de novo*. Moon v. Anderson (In re Hixon), 387 F.3d 695, 700 (8th Cir. 2004). A bankruptcy court's finding regarding solvency is reviewed for clear error. Northwest Vill. Ltd. P'ship v. Franke (In re Westpointe, L.P.), 241 F.3d 1005, 1007 (8th Cir. 2001).

## DISCUSSION

To aid in understanding the complexity of this case, the transaction needs to be described in detail. The bankruptcy court explained the history of the relationship between the debtors (referred to during the trial and hereafter as "the Phongs") and Blue Heron and the substance of the transaction, as follows:

> In June of 2003, the plaintiffs owned four parcels of real estate. They are referenced here as:

---

[1]The Honorable Dennis D. O'Brien, United States Bankruptcy Judge for the District of Minnesota.

|  | Market Value | Liabilities | Net Equity |
|---|---|---|---|
| 2205 Chicago Ave. | $ 285,000 | $ 76,000 c/d | $ 209,000 |
| 1625 Fremont Ave. | $ 325,000 | $ 370,000 mtg | $ (45,000) |
|  |  | mech lien |  |
| 6821 18 Avenue So. | $ 200,000 | $ 119,200 | $ 80,800 |
| 16188 Hominy Path | $ 500,000 | $ 270,000 | $ 230,000 |
|  | $1,310,000 | $ 835,200 | **$ 474,800** |

Three of the four properties were real estate investments. The Hominy Path property was the Phongs' newly acquired homestead. The Fremont Ave. property liability included a mechanic's lien in the amount of $250,000, owing Castle Roofing for repairs caused by a fire. The work was completed in the spring of 2003 and the amount was due in June. In the months shortly before the mechanic's lien was due, the Phongs purchased both the Hominy and Chicago Ave. properties, using $400,000 in cash. They sought financing to pay the mechanic's lien.

Mr. Phong had discussions with at least one, and possibly two, traditional lenders, but did not obtain traditional financing to cover the lien. Instead, he was introduced to the defendant Mark Erjavec, who was the owner of Blue Heron, which was in the business of purchasing mortgages in foreclosure. According to Mr. Phong, Mr. Erjavec offered to purchase all four properties from the Phongs and sell them back on a contract for deed. Additionally, according to Mr. Phong, Mr. Erjavec agreed to participate with Mr. Phong in partnership to enable Mr. Phong to acquire deteriorated properties that he could fix up and sell profitably, enabling him to make the increased payments that would be required to service the increased debt load. Mr. Phong testified that he was guaranteed ten to twelve properties per year. Finally, Mr. Phong testified that Mr. Erjavec assured him that an equity cushion of between $85,000 and $100,000 was available as a source to fund the increased payments in the meantime.

Mr. Erjavec disputes that there was an agreement, partnership or otherwise, but, acknowledges that the parties discussed generally a cooperative effort in obtaining and dealing with deteriorated properties. There was no discussion or agreement regarding how the acquisition of such properties would be financed, who would hold title, or how any

profits would be applied between the parties. And, there was no written memorialization of any arrangement. Mr. Erjavec disclaimed any knowledge regarding an equity cushion to fund increased payments and denied making any such representation.

Sometime in early June 2003, Mr. Erjavec delivered to the Phongs a draft of a proposed agreement and contract for deed. He testified that he went over the documents with the Phongs, reading and explaining the major portions. Included in the draft agreement, and also included in the agreement eventually signed, was this provision:

> The Phongsisattanaks acknowledge and promise that this Agreement and the Contract for Deed reflect the entire agreement between them and Blue Heron and that there were (or are) no oral representations which are being relied upon by them as a basis for their decision to enter into this transaction with Blue Heron, Inc. Further, the Phongsisattanks [sic] acknowledge that any statements made prior to execution of the transaction documents by Blue Heron, Inc., its agents or employees, or yourself, outside this Agreement and the Contract for Deed have been disregarded by them as statements made during negotiations leading up to this transaction.

(Par. 8, p.4., Def. Ex. K).

On June 30, 2003, the parties signed an agreement substantially the same as the earlier draft, and the defendants signed a contract for deed to the Phongs for the total purchase price of $950,000 for the four properties. The price was arrived at by adding up all liabilities against the properties, plus a $50,000 cash payment by the defendants to the Phongs, closing costs in the approximate amount of $18,000, and a fee assessed by the defendants for their participation. The agreement provided that the defendants were to assume the existing mortgages and pay the contract for deed on the Chicago property. The contract for deed recited that it was given by Blue Heron, subject to existing financing, but obligated the vendor to convey a marketable title to the Phongs upon payment of the contract in full. The Phongs delivered their warranty deed, subject to existing encumbrances, to Blue Heron on July 9, 2003.

4

The contract for deed required monthly payments from the Phongs of $7,304.68. No payments were made. No payments were made by the defendants on the mortgages and Chicago contract for deed either. Sometime late in the summer of 2003, the Phongs were contacted by at least one of the mortgagees and told that a delinquency existed. When informed of the transaction with the defendants, the mortgagee told the Phongs that the mortgage was not assumable, but, had a "due on sale" clause.

Mr. Phong contacted Mr. Erjavec, who acknowledged that he had made no payments on the mortgages and the Chicago contract for deed because the Phongs had made no payments to Blue Heron. At that point, Mr. Phong indicated that he wished to make the mortgage payments directly. Mr. Erjavec agreed and prepared a new amortization schedule for the payments due Blue Heron from the Phongs in the monthly amount of $2,500. The Phongs made a total of $4,000 to the defendants under the revised schedule by February 2004.

In February, Blue Heron assigned its rights under the Phong contract for deed to a company called Caberallo. The defendants had borrowed $240,000 from the principal of Caerallo [sic] to fund the Phong agreement and contract for deed. In return for the assignment, Caberallo cancelled all indebtedness owing the principal from the defendants.

In March 2003, Caberallo served the Phongs a notice of cancellation of the Phong contract for deed. The Phongs retained an attorney, who advised Caberallo that the contract for deed was an equitable mortgage and could not be cancelled, but, must be foreclosed upon as a traditional mortgage. Apparently, the assertion was persuasive. The parties entered into a written agreement substantially altering their rights and obligations under the contract for deed.

It was agreed that the non-homestead properties would be sold, all mortgages encumbering them paid out of the proceeds, and that the Phongs would receive marketable title to their Hominy homestead property. The Phongs were to pay $10,000 toward the balance of the contract for deed on the Chicago property, Caberallo would pay $65,000.

5

The marketable title to the Hominy property was to be delivered upon the release of certain tax liens on the Chicago property resulting from the vendor's liability for taxes owing the IRS. The agreement between the Phongs and Caberallo was fully consummated, except that the Phongs were given a limited warranty deed to their Hominy property. Caberallo did not satisfy the Phongs' purchase money mortgage on that property.

Order for Judgment at 2-6, Appellant's Supplemental App., Tab 1 (footnotes omitted).

The court then found that, at the time of the transaction, the debtors were not insolvent, nor did the transaction render the debtors insolvent. On page 7 of the order, the court clearly laid out the status of the equity of the debtors after the transaction:

After the transaction, the plaintiffs' equity was reduced only by the closing costs and transaction fee assessed against them, leaving them with an equity position of $410,200. This was their position following delivery of the deed:

| | Market Value | Liabilities | Net Equity |
|---|---|---|---|
| 2205 Chicago Ave. | $ 285,000 | $ 76,000 c/d | $ 209,000 |
| 1625 Fremont Ave. | $ 325,000 | $ 370,000 mtg | $ (45,000) |
| | | mech lien | |
| 6821 18 Avenue So. | $ 200,000 | $ 119,200 | $ 80,800 |
| 16188 Hominy Path | $ 500,000 | $ 270,000 | $ 230,000 |
| **June 29, 2003** | $1,310,000 | $ 835,200 | **$ 474,800** |
| | | | |
| Contract for Deed B/H | | $950,000 | |
| Cash received | $ 50,000 | | |
| Contract right to pay-ment of liens | $ 835,200 | | |
| **July 10, 2003** | $2,195,200 | $1,785,000 | **$ 410,200** |
| | | | |
| Net change in equity | | | **($ 64,600)** |

Id. at 7.

6

A transfer is fraudulent as to pre-transfer creditors under Minnesota law if it is made by a debtor for less than reasonably equivalent value received when the debtor is either insolvent at the time of the transfer or is rendered insolvent by it. Minn. Stat. § 513.45(a).[2] The bankruptcy court correctly found, based upon an analysis of the testimony of the expert witness for the defendants, that because the debtors were solvent at all times, they had failed to meet their burden with regard to insolvency and therefore could not prevail on the fraudulent conveyance action.

On appeal, the debtors/appellants suggest that the bankruptcy court erred because it chose to believe the numbers presented by that expert, rather than the numbers presented by their own expert.[3] A factual finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985)

---

[2]513.45. Transfers fraudulent as to present creditors

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

[3]Debtors appealed the finding that the transaction with Blue Heron was not actually a sale but was an equitable mortgage. The characterization of the transaction does not change the numbers, and does not affect the solvency/insolvency determination.

7

(quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)). When two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly erroneous. <u>Anderson</u>, 470 U.S. at 574 (citing <u>United States v. Yellow Cab Co.</u>, 338 U.S. 338, 342 (1949)).

We find that the trial judge's determination that the debtors/appellants were not insolvent at any time with regard to this transaction is not clearly erroneous. Since there cannot be a fraudulent conveyance under Minnesota law unless the transferor is insolvent at the time of the transaction or is made insolvent by the transaction, we affirm.

_____