# United States Court of Appeals
## For the First Circuit

No. 12-1586

FRANK SAWYER TRUST OF MAY 1992, Transferee;
CAROL S. PARKS, Trustee,

Petitioner, Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES TAX COURT

Before

Lynch, <u>Chief Judge</u>,
Boudin[*] and Stahl, <u>Circuit Judges.</u>

<u>Francesca U. Tamami</u>, Tax Division, Department of Justice, with whom <u>Gilbert S. Rothenberg</u>, <u>Kenneth L. Greene</u>, Tax Division, Department of Justice, <u>Kathryn Keneally</u>, Assistant Attorney General, and <u>Tamara W. Ashford</u>, Deputy Assistant Attorney General, were on brief for appellant.
<u>David R. Andelman</u> with whom <u>Juliette Galicia Pico</u> and <u>Lourie & Cutler, P.C.</u> were on brief for appellee.

March 29, 2013

---

[*]Judge Boudin heard oral argument in this matter, and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

**LYNCH, Chief Judge.** This case involves the Internal Revenue Service's efforts to collect taxes and penalties assessed upon four corporations. The corporations acknowledged that they owed the federal government more than $24 million in taxes and penalties, but before the Internal Revenue Service (IRS) could collect against the corporations, the corporations rendered themselves insolvent by transferring all of their assets to other entities.

The issue in dispute is whether the previous owner of the four corporations, the Frank Sawyer Trust of May 1992, is liable to the IRS for the corporations' unpaid taxes and penalties. The Trust sold the corporations before the taxes came due and before the asset-stripping occurred. Following well-established Supreme Court precedent, the Tax Court looked to state substantive law--here, the Massachusetts Uniform Fraudulent Transfer Act--to determine the Trust's liability. The court concluded that the Trust could not be held liable for the corporations' taxes and penalties because the IRS failed to prove that the Trust had knowledge of the new shareholders' asset-stripping scheme and because the IRS did not show that any of the corporation's assets were transferred directly to the Trust.

The Commissioner of Internal Revenue now seeks review of the Tax Court's decision. The Commissioner claims that the Tax Court should have applied the federal substance-over-form doctrine

-2-

to determine, as a threshold matter, whether the Trust should be considered a "transferee" of the four corporations' assets. The Commissioner also argues that the Tax Court clearly erred in finding that the Trust lacked constructive knowledge of the new shareholders' scheme.

We conclude that the Tax Court correctly looked to Massachusetts law to determine whether the Trust could be held liable for the corporations' taxes and penalties, and we reject the Commissioner's argument that the Tax Court was obligated to consider the federal substance-over-form doctrine as a threshold matter. We also decline to disturb the Tax Court's factual finding that the Trust lacked knowledge--actual or constructive--of the new shareholders' tax avoidance intentions.

However, we part ways with the Tax Court insofar as the Tax Court construed Massachusetts fraudulent transfer law to require, as a prerequisite for the Trust's liability, either (1) that the Trust knew of the new shareholders' scheme or (2) that the corporations transferred assets directly to the Trust. The IRS has presented evidence of fraudulent transfers from the four companies to various acquisition vehicles, and the acquisition vehicles purchased the four companies from the Trust. If the Tax Court finds that at the time of the purchases, the assets of these acquisition vehicles were unreasonably small in light of their liabilities and that the acquisition vehicles did not receive

-3-

reasonably equivalent value in exchange for the purchase prices, then the Trust could be held liable for taxes and penalties assessed upon the four corporations regardless of whether it had any knowledge of the new shareholders' asset-stripping scheme. We recognize that these issues have not been clearly raised and fully briefed by the parties, but there is no waiver and we can move beyond the parties' arguments. We leave it to the Tax Court to determine, on remand, whether the conditions for liability are met in this case.

## I.  Background

Upon Frank Sawyer's death in 1992, a marital deduction trust was established for the benefit of his widow, Mildred Sawyer. See generally  Rabkin & Johnson, Federal Income, Gift & Estate Taxation § 52.20 (Matthew Bender & Co. 2012) (overview of marital deduction trusts).  The Trust owned a portfolio of stocks in closely-held corporations, and Frank and Mildred Sawyer's daughter, Carol Parks, served as the chief executive officer and president of the companies owned by the Trust from 1992 onwards. At the time of Mildred Sawyer's death in March 2000, her taxable estate, which included Trust assets, was determined to be in excess of $138 million, and her death triggered federal estate and Massachusetts inheritance tax liabilities exceeding $76 million, due in December 2000. See 26 U.S.C. § 6075(a) (2000) (estate tax returns due nine months after death).

-4-

Parks, who became the sole trustee and non-charitable beneficiary of the Trust upon her mother's death, decided to liquidate two Trust-owned companies--Town Taxi Inc. and Checker Taxi Inc.--in order to generate cash to meet the estate's large tax liabilities. Town Taxi and Checker Taxi both held valuable taxi medallions which conferred the right to operate a cab service in the City of Boston and to pick up passengers at Logan Airport. By August 2000, the two taxi companies had sold or entered into agreements to sell all their medallions and other assets. The sales triggered large corporate income tax liabilities for both Town Taxi and Checker Taxi.

Shortly before Mildred Sawyer's death, the Trust's longtime attorney, Walter McLaughlin, had received a promotional letter from a company called MidCoast Credit Corp., which advertised itself as being in the business of buying corporations that were in the process of selling all their assets and that would face large tax liabilities related to their liquidations. After Mildred Sawyer died, McLaughlin contacted MidCoast to inquire about sale possibilities. A MidCoast representative said that the company did not have the financial resources to purchase Town Taxi and Checker Taxi at that time, but the representative referred McLaughlin to another firm, Fortrend International, LLC, which conducted similar transactions.

Fortrend, which represented itself as an investment bank with offices in four U.S. cities as well as Melbourne, Australia, offered to purchase the stock of the taxi companies from the Trust once the companies had liquidated all of their assets and satisfied all of their non-tax liabilities. Fortrend offered to pay a price equal to the value of the companies' assets (which by that point consisted only of cash) minus 50% of the value of the companies' tax liabilities. Thus, in the case of Town Taxi, which held about $18.6 million in cash and faced federal and state tax liabilities of approximately $7.5 million, Fortrend would pay the Trust roughly $14.85 million (i.e., $18.6 million minus 50% of $7.5 million). In the case of Checker Taxi, which held about $21 million in cash and faced federal and state tax liabilities of approximately $6.8 million, Fortrend would pay the Trust roughly $17.6 million. These purchase prices represented significant premiums above the amount that the Trust would receive if the companies paid their federal and state tax bills themselves and then distributed the remainder to the Trust (which would result in the Trust receiving roughly $11.1 million from Town Taxi and approximately $14.2 million from Checker Taxi).

Before consummating the transaction with Fortrend, Town Taxi and Checker Taxi deposited their cash in accounts at the Dutch financial institution Rabobank. Meanwhile, Town Taxi and Checker Taxi changed their names to TDGH, Inc., and CDGH, Inc.,

respectively, so that the Trust could retain the taxi companies' names after the sale. (The Trust would later sell the Town Taxi name to a third party and retain the Checker Taxi name itself.) Also prior to the transaction, Fortrend formed a new Delaware limited liability company, Three Wood LLC, which borrowed $30 million from Rabobank. On October 11, 2000, Three Wood wired more than $32.4 million to the Trust's account (the combined purchase price for the two companies, plus a small amount of interest); the Trust delivered the stock of TDGH and CDGH to Three Wood, and Three Wood transferred the stock to two shell corporations that it had set up. Three Wood then transferred the cash in the two companies' accounts to its own account at Rabobank. Three Wood repaid the $30 million Rabobank loan on October 12 and, over the next eleven weeks, moved most of the remaining cash into accounts held by other Fortrend entities. By the end of 2000, all but $93,602 had been stripped from TDGH, which faced federal and state tax liabilities of $7.5 million; and all but $308,639 had been removed from CDGH, which faced federal and state tax liabilities of $6.8 million. The record reveals no evidence that Carol Parks or the Trust's representatives knew anything about Fortrend's post-sale activities.

The following year, the Trust decided to liquidate the assets of two more of its portfolio companies and sell those companies--which by that point would hold only cash--to Fortrend.

-7-

One of the two, St. Botolph Holding Company, was in the process of selling three properties in Boston to Northeastern University; the other company, Sixty-Five Bedford Street, Inc., was negotiating the sale of a property in Boston's Beacon Hill neighborhood to Suffolk University. St. Botolph would face tax liabilities of more than $8.5 million on its gains from the sale to Northeastern, and Sixty-Five Bedford would face a corporate income tax liability of slightly more than $2 million on its gains from the sale to Suffolk as well as its disposition of its remaining properties.

Again, Fortrend used controlled subsidiaries to consummate the deals, with Rabobank playing a facilitating role. On February 26, 2001, St. Botolph deposited all of its cash (slightly less than $21.7 million) in a Rabobank account. This time, the Trust and Fortrend agreed that the purchase price formula would be the value of the company's cash minus 37.5% of its tax liabilities (a more favorable deal from the Trust's perspective than either of the previous transactions). Thus, the purchase price would be approximately $18.5 million. Meanwhile, Rabobank agreed to lend $19 million to a Fortrend subsidiary named Monte Mar, Inc. On February 27, Rabobank transferred $19 million to Monte Mar; Monte Mar wired approximately $18.5 million to the Trust's account, and then the Trust delivered all of St. Botolph's stock to Monte Mar. The same day, Monte Mar took $19 million out of St. Botolph's account and moved the money to its own account; the following day,

Monte Mar used those funds to repay the Rabobank loan in full. Over the next ten months, Fortrend stripped most of the remaining cash out of St. Botolph, leaving St. Botolph with a year-end balance of roughly $366,000 (not nearly enough to satisfy tax liabilities exceeding $8.5 million).

The Sixty-Five Bedford deal was the smallest of the four: at the time of the sale, the company held approximately $5.9 million in cash. This time, Fortrend did not need to take out a loan from Rabobank in order to finance the transaction; instead, Fortrend provided the necessary cash itself. The parties reverted to the initial funding formula (cash minus 50% of tax liabilities); a Fortrend-controlled entity, SWRR, Inc., borrowed approximately $4.9 million from another Fortrend entity, SEAP, and then transferred the loan proceeds to the Trust's account on October 4, 2001, in exchange for all of Sixty-Five Bedford's stock. The next day, Fortrend/SWRR transferred $4.9 million from Sixty-Five Bedford to SEAP to pay off SWRR's loan from SEAP. Over the next several weeks, Fortrend stripped Sixty-Five Bedford of nearly all its cash, leaving the company with a year-end account balance of $336,833 and tax liabilities exceeding $2 million.

Although Fortrend had agreed to assume the tax liabilities of each of the four companies, it evidently had a strategy to offset all of these liabilities. In 2000, a Fortrend subsidiary made contributions to TDGH and CDGH of stock in other

companies that had ostensibly declined in value, and Fortrend had TDGH and CDGH claim losses on those stock holdings that supposedly offset nearly all the corporate-level gains from the taxi medallion sales. TDGH and CDGH then claimed no net tax liability on their 2000 federal tax returns. Fortrend attempted a similar set of maneuvers with respect to St. Botolph and Sixty-Five Bedford, and those companies claimed at the end of 2001 that they owed nothing in federal taxes.

The IRS subsequently examined all four companies' tax returns and disallowed the deductions. Each of the companies ultimately signed closing agreements with the IRS in which the companies conceded that they owed--in the aggregate--back taxes of more than $20.3 million and penalties of nearly $4 million.

Meanwhile, the Trust reported on its 2000 federal income tax return that it had no gain or loss on the sale of Town Taxi or Checker Taxi, since the basis of property that a taxpayer receives from a decedent is "stepped up" under 26 U.S.C. § 1014(a) to its fair market value at the time of the decedent's death. On its 2001 return, the Trust reported a long-term capital gain of more than $12.1 million from its sale of St. Botolph stock and a long-term capital gain of more than $2.3 million from its sale of Sixty-Five Bedford stock. The IRS initially disputed the Trust's calculation of its capital gains tax liabilities, but the parties settled out of court. Pursuant to the parties' agreement, the Tax Court

-10-

entered judgments holding that the Trust was not liable for deficiencies or accuracy-related penalties with respect to either the 2000 or 2001 returns.

However, that compromise did not resolve the question presented here, which is whether the Trust is liable as a transferee for deficiencies and penalties initially assessed to the four companies. The IRS issued notices of transferee liability to the Trust on December 8, 2006. The Trust filed a timely petition in Tax Court contesting those notices on March 7, 2007. The Trust then moved for summary judgment, arguing that the notices of transferee liability were barred by res judicata and/or collateral estoppel arising out of the earlier proceedings. The Tax Court denied the Trust's summary judgment motion in Frank Sawyer Trust of May 1992 v. Commissioner (Frank Sawyer Trust I), 133 T.C. 60 (2009), and the Trust does not challenge the Tax Court's reasoning here.

Following the denial of the Trust's motion for summary judgment, the Tax Court held a trial in Boston on October 18, 2011, and the court issued its decision on December 27, 2011. Frank Sawyer Trust of May 1992 v. Comm'r (Frank Sawyer Trust II), T.C. Memo 2011-298, 2011 Tax Ct. Memo LEXIS 296 (2011).

## II. The Tax Court's Decision

As an initial matter, the Tax Court noted that the federal statute authorizing the collection of taxes from transferees, 26 U.S.C. § 6901(a)(1), provides only a procedural remedy against an alleged transferee; substantive state law controls whether a transferee is liable for a transferor's tax liabilities. See Comm'r v. Stern, 357 U.S. 39, 45 (1958) (construing earlier version of statute); United States v. Verduchi, 434 F.3d 17, 20 (1st Cir. 2006); Coca-Cola Bottling Co. of Tucson v. Comm'r, 334 F.2d 875, 877 (9th Cir. 1964). The state whose substantive law controls in this context is Massachusetts.

Massachusetts has adopted the Uniform Fraudulent Transfer Act. See Fed. Refinance Co. v. Klock, 352 F.3d 16, 23 n.2 (1st Cir. 2003). The IRS's arguments and the Tax Court's analysis focused on three provisions of that Act. See Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 5(a)(2), 6(a) (2012). All three provisions potentially apply to cases in which a debtor makes a transfer and then fails to make good on debts due to another creditor.

Section 5(a)(1) of the Uniform Act applies when the transferee has "actual intent to hinder, delay, or defraud any creditor of the debtor." Id. § 5(a)(1) (emphasis added). Section 5(a)(2) applies when the debtor does not "receiv[e] a reasonably equivalent value in exchange for the transfer" and, at the time of the transaction, the debtor "was engaged or was about to engage

-12-

in . . . a transaction for which the remaining assets of the debtor were unreasonably small in relation to the . . . transaction" or the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Id. § 5(a)(2).  Section 6(a) applies when "the debtor made the transfer . . . without receiving a reasonably equivalent value . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer."  Id. § 6(a).

Before applying the Uniform Fraudulent Transfer Act's provisions, the Tax Court first considered whether the four corporations had made any "transfer"--fraudulent or otherwise--to the Trust.  Formally, the Trust did not receive direct distributions from any one of the four companies; rather, the Trust sold each company to a Fortrend-controlled acquisition vehicle, which paid the purchase price primarily using funds borrowed from Rabobank (or, in the last deal, funds supplied by another Fortrend entity).  Before the Tax Court and on appeal, the IRS argues that the transactions should be "collapsed":  instead of treating each transaction as one in which a Fortrend affiliate purchased a company from the Trust and then stripped the company of cash, the IRS seeks to re-characterize each of the deals as a liquidating distribution from the company to the Trust, with the Fortrend affiliates as mere conduits.

-13-

Whether transactions such as these should be "collapsed" is "a difficult issue of state law . . . on which there is fairly limited precedent." Brandt v. Wand Partners, 242 F.3d 6, 12 (1st Cir. 2001). Finding little guidance from Massachusetts case law, the Tax Court looked to cases from other jurisdictions holding that multiple transactions should be collapsed into one for the purposes of a fraudulent transfer claim only when the creditor seeking recovery can "prove that the multiple transactions were linked and that the purported transferee had either actual or constructive knowledge of the entire scheme." Frank Sawyer Trust II, 2011 Tax Ct. Memo LEXIS 296, at *40; see, e.g., HBE Leasing Corp. v. Frank, 48 F.3d 623, 635-36 & n.9 (2d Cir. 1995) (transactions can be collapsed where transferee had actual or constructive knowledge of the structure of the transaction; burden of proving knowledge rests on the party seeking to have the transactions collapsed).

When the IRS is using the § 6901 procedural mechanism to collect taxes from a transferee, the IRS bears the burden of proving the transferee's liability (although the IRS does not bear the burden of proving that the transferor was liable for the tax in the first instance). 26 U.S.C. § 6902(a). The Tax Court found that the IRS failed to carry its burden. First, the court found that the Trust lacked "actual knowledge" of Fortrend's post-sale plans. Frank Sawyer Trust II, 2011 Tax Ct. Memo LEXIS 296, at *41. As for "constructive knowledge," the Tax Court conceded that "there

-14-

is uncertainty as to the trust's level of inquiry regarding Fortrend's postclosing activities," but the court also added that the IRS had "fail[ed] to explain why the trust was obligated to determine the propriety" of Fortrend's tax offset claims. Id. at *42-43. Once the court concluded that the Trust lacked actual or constructive knowledge of Fortrend's post-sale plans and thus that the transactions could not be collapsed, it followed that no "transfer" from the four companies to the Trust had occurred. In the Tax Court's view, this meant that there could be no basis for liability under any provision of the Uniform Fraudulent Transfer Act.

Nonetheless, the Tax Court included a final section titled "Federal Tax Doctrines" that addressed, in particular, the federal tax law doctrine of "substance over form." Id. at *49-54. See generally Gregory v. Helvering, 293 U.S. 465 (1935). In Gregory, the Supreme Court held that a corporate reorganization should be disregarded for federal income tax purposes when the reorganization had "no business or corporate purpose" and the "sole object" of the transaction was "the consummation of a preconceived plan" to avoid taxes. 293 U.S. at 469. Here, the Tax Court held that the substance-over-form doctrine did not apply because the Trust had "no preconceived plan to avoid taxation." Frank Sawyer Trust II, 2011 Tax Ct. Memo LEXIS 296, at *51 (internal quotation marks omitted). The Tax Court again emphasized that the Trust did

-15-

not "know[] of Fortrend's illegitimate scheme to fraudulently offset the tax liabilities of the corporations." Id.

Accordingly, the Tax Court entered a decision for the Trust, finding no liability. Id. at *54. The IRS filed a timely petition for review in this circuit, where venue is proper. See 26 U.S.C. § 7482(b)(1).

### III.  IRS's Petition for Review

We review the Tax Court's legal conclusions de novo and its factual findings for "clear error." Drake v. Comm'r, 511 F.3d 65, 68 (1st Cir. 2007). The IRS emphasizes two objections to the Tax Court's decision. First, the IRS argues that the Tax Court should have applied the federal substance-over-form doctrine to determine whether the Trust is a "transferee" for purposes of 26 U.S.C. § 6901 before looking to Massachusetts fraudulent transfer law. Second, the IRS challenges the Tax Court's factual finding that the Trust lacked constructive knowledge of Fortrend's tax avoidance scheme. Since a finding of constructive knowledge on the part of the Trust would have led the Tax Court to collapse the transactions under state law, see Frank Sawyer Trust, 2011 Tax Ct. Memo LEXIS 296, at *40, the IRS's challenge to this factual finding stands independent from its argument that the Tax Court should have applied the federal substance-over-form doctrine.

A.   "Skipping Ahead"

The IRS first argues that the Tax Court erred by "skip[ping] ahead" to the state law issues before resolving the question of whether the Trust is a "transferee" for purposes of 26 U.S.C. § 6901.  After reviewing the Service's claims, we see no reason why the Tax Court should have addressed the federal tax law question before the Massachusetts law question.  While it is true that the IRS can only use the § 6901 procedural mechanism to collect taxes from a "transferee" as that term is defined by federal law, see 26 U.S.C. § 6901(h), it is also true that the IRS can only rely on the Massachusetts Uniform Fraudulent Transfer Act to collect from a "transferee" as that term is construed for the purposes of state law.  Stern, 357 U.S. at 45 ("existence and extent" of the transferee's liability "should be determined by state law"); Starnes v. Comm'r, 680 F.3d 417, 419 (4th Cir. 2012). Thus, if the Trust was not a "transferee" of the companies for purposes of Massachusetts fraudulent transfer law, then whether or not it was a "transferee" for purposes of § 6901 is irrelevant. And if the Tax Court believed that it could resolve the case more expeditiously by deciding the question of state law liability before the federal tax law question, then it was not error for the court to consider the issues in that order.  See Starnes, 680 F.3d at 430 ("because the Commissioner has failed to prove the [f]ormer [s]hareholders are liable under state law . . . , we need not and

-17-

do not decide whether they are . . . 'transferees' . . . within the meaning of § 6901").

The IRS also argues that Massachusetts courts apply something akin to the federal substance-over-form doctrine in fraudulent transfer cases. See, e.g., Galdi v. Caribbean Sugar Co., 99 N.E.2d 69, 71-72 (Mass. 1951). Moreover, the IRS contends that under the substance-over-form doctrine, the "objective economic realities"--not the parties' subjective beliefs--determine the characterization of a transaction. See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978) ("objective economic realities" are controlling). But although Massachusetts' highest court has said that "[u]ndoubtedly, equity, particularly in cases of alleged fraud, will disregard the form to ascertain the substance of a transaction," the court said in the same breath that before it will disregard the form of a transaction, the litigants challenging the transaction's form must demonstrate that both parties to the transaction structured it with an intent "to hinder, delay, and defraud." Galdi, 99 N.E.2d at 71-72. And here, the Tax Court found no such intent on the part of the Trust.[1]

_____

[1]The IRS further contends that the Tax Court erred by finding that there was no "circular flow of funds" among the Trust, the corporations, and Fortrend. But the "circular flow of funds" rule is an element of the tax law doctrine of substance over form. See, e.g., Merryman v. Comm'r, 873 F.2d 879, 882 (5th Cir. 1989) ("a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes"). While Massachusetts courts may consider a "circular flow" of money to be evidence of a "sham" transaction in the context of a state tax

-18-

B.  Constructive Knowledge

Trying a different tack, the IRS argues that even if the Trust's knowledge of the scheme is required in order for us to collapse the two transactions into one, the Tax Court clearly erred in finding that the Trust lacked constructive knowledge of Fortrend's tax avoidance scheme.  But the "clear error" standard presents a "high hurdle," Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 15 (1st Cir. 2012)--too high a hurdle to jump over in this case.  Here, the Trust's agreements with Fortrend all included provisions stating that Fortrend would be liable for the companies' taxes.  The Trust's attorney, Walter McLaughlin, testified that he checked with Rabobank to confirm that Fortrend was a "financially responsible operation"; and Louis Bernstein, an advisor to Midcoast who participated in discussions between McLaughlin and Fortrend, testified that McLaughlin was "pretty inquisitive about the propriety of the transaction."  Moreover,

case, see Sherwin-Williams Co. v. Comm'r of Revenue, 778 N.E.2d 504, 513 (Mass. 2002); Syms Corp. v. Comm'r of Revenue, 765 N.E.2d 758, 765 (Mass. 2002), the IRS never explains why the Tax Court's alleged error regarding "circularity" undermines the court's conclusion that, in the fraudulent transfer context, Massachusetts courts would respect the form of the Trust's transactions with Fortrend.  Under Stern, when the IRS uses the procedural mechanism of 26 U.S.C. § 6901 to collect taxes from a transferee, the "state law" that applies is the state law regarding creditors' rights, not state tax law.  See, e.g., Starnes, 680 F.3d at 420 (look to North Carolina law regarding creditors' rights); Ewart v. Comm'r, 814 F.2d 321, 324 (6th Cir. 1987) (IRS "must look to Ohio's fraudulent transfer law for its rights as a defrauded creditor of the transferor-estate").

-19-

James Milone, who was chief financial officer of the corporations owned by the Trust, testified to his belief that there was "nothing wrong" with Fortrend's tax-related plans and that he was "shocked" when the IRS commenced its audit of the Trust. The Tax Court considered this testimony and concluded that "[w]hile there is uncertainty as to the trust's level of inquiry regarding Fortrend's postclosing activities," the court could "not find that the trust had constructive knowledge" of Fortrend's scheme.

We have said that "[t]he process of evaluating witness testimony typically involves fact-sensitive judgments and credibility calls that fit comfortably within the margins of the clear error standard." United States v. Matos, 328 F.3d 34, 40 (1st Cir. 2003). Our standard for reviewing Tax Court decisions is the same as our standard for reviewing district court decisions in civil actions tried without a jury, 26 U.S.C. § 7482(a)(1), and "[t]his mode of review requires us to accept the Tax Court's credibility determinations and its findings about historical facts unless, after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong." State Police Ass'n v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997). Moreover, "deferential 'clear error' review is especially appropriate" when--as here--knowledge and intent are pivotal to the Tax Court's ruling and "credibility determinations comprise a prime element" of the court's ultimate conclusion.

-20-

<u>Crowley</u> v. <u>Comm'r</u>, 962 F.2d 1077, 1080 n.4 (1st Cir. 1992). The record includes testimony indicating that at least one of the Trust's representatives did conduct a good-faith inquiry into the propriety of Fortrend's contemplated transactions, and we defer to the Tax Court's decision to credit this testimony.

## IV.  Transferee-of-Transferee Liability

We do, however, find that the Tax Court overlooked another form of liability that could apply here. The Tax Court assumed that the Trust could be held liable for the four companies' tax liabilities only if the multiple transactions were "collapsed" on the basis of the Trust's "constructive knowledge" or the application of the substance-over-form doctrine. But under the Uniform Fraudulent Transfer Act, liability may be found regardless of whether the Trust had constructive knowledge of Fortrend's intentions and regardless of whether the "form" of the transactions is fully respected.

Although the relevant statute is called the Uniform <u>Fraudulent</u> Transfer Act, "[a] corporate transfer is 'fraudulent' within the meaning of the Uniform Fraudulent Transfer Act, even if there is no fraudulent intent, if the corporation didn't receive 'reasonably equivalent value' in return for the transfer and as a result was left with insufficient assets to have a reasonable

chance of surviving indefinitely." Boyer v. Crown Stock Distribution, Inc., 587 F.3d 787, 792 (7th Cir. 2009) (Posner, J.); see, e.g., Warfield v. Byron, 436 F.3d 551, 557-59 (5th Cir. 2006) (collecting cases from various jurisdictions that have adopted the Uniform Fraudulent Transfer Act and concluding that "the transferee's knowing participation [in the transferor's fraudulent scheme] is irrelevant under the statute").

While upon first glance it might seem unfair to hold a good-faith transferee liable for the debts of the transferor, this concern is mitigated by the fact that under the Uniform Act, "a good-faith transferee or obligee is entitled, to the extent of the value given by the debtor for the transfer or obligation, to . . . a reduction in the amount of the liability on the judgment." Mass. Gen. Laws ch. 109A, § 9(d); accord Unif. Fraudulent Transfer Act § 8(d) (1984). The Uniform Fraudulent Transfer Act thus implements the sensible principle that a transferee should not be entitled to a windfall while the legitimate claims of a debtor's other creditors remain unsatisfied, but a good-faith transferee should not be held to account for the debts of the transferor beyond the extent of the windfall. See Verduchi, 434 F.3d at 24 (under Uniform Fraudulent Transfer Act, as adopted by Rhode Island, neither the innocent transferee nor the other creditors may gain an "unfair windfall").

Although the Trust's knowledge of Fortrend's intentions is irrelevant under the Uniform Act, the IRS can only collect from the Trust if the IRS was a "creditor" of a debtor who made a "transfer" to the Trust. Mass. Gen. Laws ch. 109A, §§ 5(a), 6. A "creditor" for purposes of the Uniform Act is one who "has a claim" against a debtor, and a "claim" is any "right to payment, whether or not the right is reduced to judgment." Id. § 2. Thus, if the only "transfers" to the Trust came from the Fortrend vehicles (Three Wood, Monte Mar and SWRR), the IRS can only assert a fraudulent transfer claim against the Trust if the IRS can show that it was a creditor of (i.e., has a claim against) the Fortrend vehicles.

The evidence presented by the IRS to the Tax Court provides a modest amount of support for such a finding. Recall that shortly after Three Wood acquired the taxi companies' stock, Fortrend caused the taxi companies to transfer $30 million to Three Wood, and the taxi companies received nothing in return. Moreover, the taxi companies became insolvent as a result of the transfers: TDGH and CDGH were left with less than $10 million in combined cash and more than $14 million in aggregate tax liabilities, which they proved unable to offset. These facts constitute evidence that the transfer from the taxi companies to Three Wood was fraudulent within the meaning of Massachusetts law. See id. § 5(a) (a transfer is fraudulent as to a creditor if "the debtor made the

-23-

transfer . . . without receiving reasonably equivalent value in exchange" and "the remaining assets of the debtor were unreasonably small in relation to the . . . transaction"). And arguably, if the IRS--having rejected Fortrend's attempts to offset the taxi companies' tax liabilities--became a creditor of those companies, then it has a straightforward fraudulent transfer claim against Three Wood. See id.

If the IRS has a fraudulent transfer claim against Three Wood, then the IRS is also a creditor of Three Wood under the Massachusetts Uniform Fraudulent Transfer Act. See id. § 2 ("creditor" is "person who has a claim"). And if it is a creditor of Three Wood, the IRS can recover not only from Three Wood itself, but also from parties who received fraudulent transfers from Three Wood. So if Three Wood made a fraudulent transfer to the Trust, then the IRS can recover the fraudulent transfer from the Trust, just as a creditor can generally pursue a fraudulent transfer claim against a third party who received a transfer from the debtor if the third party did not give reasonably equivalent value in exchange.

Three Wood certainly made a "transfer" to the Trust: it paid the Trust more than $32.4 million on October 10, 2000. That transfer would be fraudulent under section 5(a)(2) of the Uniform Act if it met the two additional statutory criteria: first, if Three Wood did not "receiv[e] a reasonably equivalent value in

exchange for the transfer"; and second, if Three Wood either (I) "was engaged or was about to engage in . . . a transaction for which the remaining assets . . . were unreasonably small," or (ii) "intended to incur, or . . . reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due." Id. § 5(a)(2).

With respect to the "reasonably equivalent value" prong,[2] Three Wood certainly paid a premium over the book value of the taxi companies: the taxi companies' combined book value (cash assets minus remaining tax liabilities) was roughly $25.3 million, but Three Wood paid more than $32.4 million to acquire them. This premium might have been justified if Three Wood expected that "synergy" would result from its combination with the taxi companies, see, e.g., Mellon Bank, N.A. v. Metro Comm'cns, Inc.,

---

[2]Although there is a dearth of Massachusetts case law construing the term "reasonably equivalent value," Massachusetts courts routinely look to the way that courts in other jurisdictions have interpreted identical language in uniform statutes. See, e.g., St. Fleur v. WPI Cable Sys./Mutron, 879 N.E.2d 27, 33 (Mass. 2008) (Uniform Arbitration Act); Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co., 602 N.E.2d 1085, 1087 (Mass. 1992) (Uniform Commercial Code). Moreover, the phrase "reasonably equivalent value" appears in the fraudulent transfer provision of the federal Bankruptcy Code, 11 U.S.C. § 548, and cases construing this provision offer additional guidance. See, e.g., McBirney v. Paine Furniture Co., No. 96-0031, 2003 Mass. Super. LEXIS 115, at *26-27 (Mass. Super. Ct. Mar. 31, 2003) (looking to federal bankruptcy cases to interpret "reasonably equivalent value"); see also Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998) (noting that the Uniform Fraudulent Transfer Act "derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2)").

945 F.2d 635, 647 (3d Cir. 1991) (analyzing "reasonably equivalent value" for purposes of 11 U.S.C. § 548), or if Three Wood acquired "goodwill" as part of the transaction, see Allstate Ins. Co. v. Countrywide Fin. Corp., 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012) (applying Illinois UFTA). But on this record, it is far from clear what "synergy" or "goodwill" might have come from Three Wood's acquisitions of TDGH and CDGH, as those companies held no assets other than cash and the Trust was allowed to retain the Town Taxi and Checker Taxi brand names.

Alternatively, the premium might have been justified if Three Wood and its corporate parent, Fortrend, had a legitimate and reasonable expectation that the strategy to offset the taxi companies' tax liabilities would succeed. See, e.g., Mellon Bank, 945 F.2d at 647 (no fraudulent transfer where parties had "legitimate and reasonable expectation" that transaction would prove to be profitable). While we now know that the strategy failed, the question of "reasonably equivalent value" cannot be answered on the basis of hindsight alone. See generally Onkyo Eur. Elec. GMBH v. Global Technovations, Inc. (In re Global Technovations), 694 F.3d 705, 717-19 (6th Cir. 2012). The IRS counters that Fortrend's strategy was doomed from the outset. Cf. 26 U.S.C. § 269(a) (if "principal purpose" for acquisition of corporation is to "secur[e] the benefit of a deduction" that acquirer would not otherwise enjoy, IRS may disallow deduction);

-26-

<u>Briarcliff Candy Corp.</u> v. <u>Comm'r</u>, T.C. Memo 1987-487 (1987). But we need not resolve this question ourselves. "[T]he issue of 'reasonably equivalent value' should in most cases be decided after full evidentiary development by a finder of fact, as, in general, all questions of 'reasonableness' are." <u>Baddin</u> v. <u>Olson</u> (<u>In re Olson</u>), 66 B.R. 687, 695 (Bankr. D. Minn. 1986); <u>see also</u> <u>Consove</u> v. <u>Cohen</u> (<u>In re Roco Corp.</u>), 701 F.2d 978, 981-82 (1st Cir. 1983) (applying 11 U.S.C. § 548). Thus, it is for the Tax Court to determine in the first instance whether the value of the companies transferred by the Trust to Three Wood was "reasonably equivalent" to the value of the cash transferred by Three Wood to the Trust.

If the Tax Court does find that the $32.4 million in cash that Three Wood gave to the Trust was not reasonably equivalent to the companies whose combined book value was $25.3 million, then the next question under the Uniform Act and Massachusetts law is whether, at the time of its transfers to the Trust, Three Wood either (I) was engaged or about to engage in a transaction for which its remaining assets were "unreasonably small," or (ii) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. Mass. Gen. Laws ch. 109A, § 5(a)(2). If Three Wood and Fortrend reasonably (although incorrectly) expected that the IRS would allow the loss deductions, then Three Wood's assets at the time of the transactions might not have been "unreasonably small" relative to

its obligations to Rabobank.[3]  On the other hand, if Three Wood had no potentially legitimate means of offsetting TDGH's and CDGH's tax liabilities, then the answer is yes:  after it repaid its Rabobank loan, Three Wood would not have had sufficient funds to satisfy TDGH and CDGH's obligations to the IRS.  "Whether a tax liability was reasonably foreseeable falls within the province of the trier of fact," United States v. Rocky Mountain Holdings, Inc., 782 F. Supp. 2d 106, 121 (E.D. Pa. 2011), so this too is a question for the Tax Court to decide in the first instance.  Note that the answer hinges not on what the transferor (the Trust) knew or should have known, but on what the transferee (Three Wood) knew or should have known.

In sum, the IRS became a creditor of Three Wood when Three Wood stripped the taxi companies of their cash, and as a creditor of Three Wood, the IRS gained the right to recover fraudulent transfers made by Three Wood "whether the creditor's claim arose before or after the transfer was made."  Mass. Gen. Laws ch. 109A, § 5(a).  Whether Three Wood's transfers to the Trust are also recoverable under section 5(a) of the Uniform Act depends

---

[3]The record is devoid of any indication that--prior to the purchase of the taxi companies--Three Wood held assets other than the Rabobank loan proceeds and the extra amount (approximately $2.4 million) evidently contributed by Fortrend to meet the combined purchase price of TDGH and CDGH (slightly more than $32.4 million). Rabobank's credit report on Three Wood states that Three Wood exists for the "sole purpose" of completing the taxi company transactions, and the report mentions no preexisting assets that might have enabled Three Wood to meet its debts as they came due.

on the questions of fact outlined above, but at the very least, we can say that the IRS has a plausible fraudulent transfer claim against the Trust irrespective of the substance-over-form doctrine, and irrespective of the Trust's level of knowledge (actual or constructive).

The analysis is substantially similar--although slightly simpler--with respect to the St. Botolph and Sixty-Five Bedford sales. After Monte Mar, the Fortrend affiliate, purchased St. Botolph from the Trust, Monte Mar and St. Botolph merged. The IRS has an undisputed claim against Monte Mar/St. Botolph for unpaid taxes, and the Trust is manifestly a transferee of Monte Mar/St. Botolph, since Monte Mar paid $18.5 million to the Trust. The transfer from Monte Mar to the Trust would be recoverable under section 5(a)(2) of the Uniform Fraudulent Transfer Act if (I) what Monte Mar received from the Trust (a company whose book value was only about $13 million) was not reasonably equivalent to what the Trust received from Monte Mar ($18.5 million in cash), and (ii) it was reasonably foreseeable at the time that Monte Mar would not be able to satisfy the tax liabilities that it inherited from St. Botolph. (In hindsight, we know that St. Botolph ultimately acknowledged a deficiency of more than $6.8 million with respect to the 2001 tax year.)

In the case of Sixty-Five Bedford, the Fortrend acquisition vehicle SWRR transferred $4.9 million to the Trust in

exchange for a company whose book value was only $3.9 million. After the transaction, SWRR and Sixty-Five Bedford merged. Thus, the transaction left SWRR/Sixty-Five Bedford with approximately $5.9 million in cash assets, $4.9 million in debt to SEAP (another Fortrend entity) and $2 million in tax liabilities. Again, it is for the Tax Court to determine in the first instance whether SWRR received reasonably equivalent value from the Trust, and whether it was reasonably foreseeable that SWRR/Sixty-Five Bedford would not be able to satisfy future tax liabilities. And again, none of these determinations turns on the question of "fraud" in the traditional sense: "A corporate transfer is 'fraudulent' within the meaning of the Uniform Fraudulent Transfer Act, even if there is no fraudulent intent, if the corporation didn't receive 'reasonably equivalent value' in return for the transfer and as a result was left with insufficient assets to have a reasonable chance of surviving indefinitely." Crown Stock Distribution, 587 F.3d at 792.

Even so, the IRS can collect from the Trust under 26 U.S.C. § 6901 only if the Trust is--for purposes of federal law--a "transferee" of the property of a taxpayer who otherwise would be liable for such tax. 26 U.S.C. § 6901(a)(1); see also id. § 6901(h) ("transferee" defined to include, inter alia, any "donee, heir, legatee, devisee, and distributee"). And it is true that, as the Trust points out, the Trust did not receive assets directly

from Town Taxi, Checker Taxi, St. Botolph or Sixty-Five Bedford. Rather, the Trust received transfers from Fortrend-controlled entities which in turn received transfers from the four companies.

Yet "it is well-settled that transferee liability may be asserted against a transferee of a transferee," Berliant v. Comm'r, 729 F.2d 496, 497 n.2 (7th Cir. 1984); see also 26 C.F.R. § 301.6901-1(c)(2) (2012), and the Trust is quite clearly "a transferee of a transferee" of each of the four companies. See generally 14A Mertens Law of Federal Income Taxation § 53:24, at 53-67 (Thomson Reuters/West Sept. 2011 Supp.) (liability of "transferee of transferee").

With respect to each of the four companies that the Trust sold to Fortrend, then, the Fortrend-controlled entity that consummated the acquisition was a "transferee" of the company, and the Trust, in turn, was a "transferee of a transferee." And so long as the Trust was a recipient of fraudulent transfers from the Fortrend vehicles, then the IRS--as a creditor of (i.e., claimant against) the Fortrend entities--can recover from the Trust.

Put differently, the Tax Court assumed that if the transfer from each of the companies to the respective Fortrend-controlled acquisition vehicle could not be "collapsed" with the transfer from the Fortrend vehicle to the Trust, then the Trust could escape transferee liability. But in each of the four cases (Town Taxi, Checker Taxi, St. Botolph and Sixty-Five Bedford),

there were potentially <u>two</u> fraudulent transfers: one transfer from the company to the Fortrend entity, and another transfer from the Fortrend entity to the Trust. The fraudulent transfer from the company to the Fortrend entity made the IRS a creditor of the latter, and as the Fortrend entity's creditor, the IRS can recover from the Trust provided that the Trust received a fraudulent transfer from the Fortrend entity.

If the Tax Court finds that the Fortrend entities received reasonably equivalent value from the Trust, or if the Tax Court concludes that it was not reasonably foreseeable that Fortrend's gain-loss offset strategy would fail, then the Tax Court should reenter its judgment for the Trust. If, however, the Tax Court concludes that the Trust <u>was</u> the recipient of fraudulent transfers from Fortrend acquisition vehicles that were themselves recipients of fraudulent transfers from TDGH, CDGH, St. Botolph and Sixty-Five Bedford, that still leaves the question of the <u>amount</u> of the Trust's liability. And while we leave it to the Tax Court to answer this question on remand (if, indeed, it becomes necessary to answer the question), we mention one more consideration that may guide the Tax Court's decision.

The IRS issued a notice of liability to the Trust for $6,100,159 in taxes on account of TDGH, $5,722,441 on account of CDGH, and $6,839,682 and $1,664,315 on account of St. Botolph and Sixty-Five Bedford, respectively (in addition to interest and

penalties).  However, according to the parties' stipulations, the amount over and above book value that the various Fortrend acquisition vehicles paid to the Trust was $3,754,737 for TDGH, $3,390,308 for CDGH, $5,329,523 for St. Botolph and $1,020,500 for Sixty-Five Bedford.[4]  Thus, for each company, the amount specified in the IRS' notice of liability is substantially greater than the difference between the purchase price and the net asset value (cash less tax liabilities) of the acquired company.

But as mentioned above, under the Uniform Act and Massachusetts law, "a good-faith transferee . . . is entitled, to the extent of the value given the debtor for the transfer . . . , to . . . a reduction in the amount of liability on the judgment." Mass. Gen. Laws ch. 109A, § 9(d); see also Unif. Fraudulent Transfer Act prefatory note (1984) ("good faith transferee or obligee who has given less than a reasonable equivalent is nevertheless allowed a reduction in liability to the extent of the value given").  And Stern holds that the liability of a transferee (or, as here, the transferee of a transferee) is a question of state law.  Stern, 357 U.S. at 45; see also Verduchi, 434 F.3d at 20 ("if the government seeks to recover a debtor's tax deficiency in the form of a judgment against the transferee, state law applies to set the amount of recovery" (emphasis added)).  Thus, if the Tax

---

[4]Note that the companies' tax liabilities were both federal and state, while the IRS' notices of liability only cover federal taxes due.

Court finds that the Trust was a "fraudulent transferee" within the meaning of Mass. Gen. Laws ch. 109A, § 5(a)(2) but a "good-faith transferee" within the meaning of Mass. Gen. Laws ch. 109A, § 9(d), then the IRS' recovery, apart from interest and penalties, would be limited to the difference between the purchase price and the fair value of each of the acquired companies--less than what the IRS seeks, but more than what the Tax Court awarded (which was nothing).

We acknowledge that the particular theory of liability adopted here--that the Trust is potentially liable for the corporations' unpaid taxes as a "transferee of a transferee"--is not identical to the theory adopted by the IRS in its arguments before the Tax Court and on appeal. But the IRS has certainly preserved the claim that the Trust is liable under Mass. Gen. Laws ch. 109A, § 5(a)(2) for the unpaid taxes of TDGH, CDGH, St. Botolph and Sixty-Five Bedford. The Service has likewise preserved the claim that it can collect from the Trust through the procedural mechanism established by 26 U.S.C. § 6901.[5] And although the IRS

---

[5]When the IRS seeks to collect taxes from a transferee of a transferee (rather than a direct transferee), "it is not required to specifically label the asserted liability as being that of a transferee or of a transferee of a transferee nor to evaluate its legal effect." 14A Mertens Law of Federal Income Taxation § 53:24, at 53-68; see also Bos Lines, Inc. v. Comm'r, T.C. Memo 1965-71, 1965 Tax Ct. Memo LEXIS 259, at *31 (T.C. 1965) ("when the addressee receives notice of liability for the deficiency of the taxpayer it is not material whether the respondent has labeled the liability as that of transferee or of transferee of a transferee"), aff'd, 354 F.2d 830 (8th Cir. 1965).

failed to articulate the <u>theory</u> underlying this claim with ideal clarity, the Service placed into the record substantial evidence that supports this theory.  See <u>United States</u> v. <u>One Urban Lot Located at 1 St. A-1</u>, 885 F.2d 994, 1001 (1st Cir. 1989) ("an appellate court can go beyond the <u>reasons</u>--as distinguished from the <u>issue</u>--articulated in the parties' briefs to reach a result supported by law"); <u>see also</u> <u>United States</u> v. <u>García-Ortiz</u>, 528 F.3d 74, 85 (1st Cir. 2008).

That said, the transferee-of-transferee theory articulated above turns on answers to factual questions that were not resolved in the Tax Court's opinion.  The parties will have the opportunity to address these questions in further Tax Court proceedings, and the Trust is free to reassert any applicable defenses in the Tax Court on remand.

The decision of the Tax Court is <u>reversed</u>, and the case is <u>remanded</u> to the Tax Court for further proceedings in accordance with this opinion.