WILLIAM SCOTT STUART, JR., TRANSFEREE, ET AL.,[1] PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1685–11, 1686–11, 1687–11, 1688–11.     Filed April 1, 2015.

R issued notices of transferee liability to Ps to collect L's unpaid Federal income tax pursuant to I.R.C. sec. 6901. R argues that the following two-step analysis applies in determining whether Ps are liable for L's unpaid tax: (1) applying doctrines pertinent to interpreting the Internal Revenue Code, determine whether the form of the subject transactions should be disregarded in favor of deciding, on the basis of the substance of the transactions, whether Ps are transferees for purposes of I.R.C. sec. 6901 and (2) apply State law to the transactions resulting from the first step. *Held*: Following our report in *Swords Trust v. Commissioner*, 142 T.C. 317 (2014), R's two-step analysis is rejected; additional reasons are stated. *Held*, *further*, transferee liability is established under the Nebraska Uniform Fraudulent Transfer Act (UFTA) because L's transfer was constructively fraudulent as to R and the transfer was made for the benefit of Ps. *Held*, *further*, unmatured tax liabilities are "claims" within the meaning of that term as defined in UFTA. *Held*, *further*, Ps, for whose benefit the transfer was made, are transferees within the meaning of I.R.C. sec. 6901.

---

[1] Cases of the following petitioners are consolidated herewith: Arnold John Walters, Jr., Transferee, docket No. 1686–11; James Stuart, Jr., Transferee, docket No. 1687–11; and Robert Edwin Joyce, Transferee, docket No. 1688–11.

*Steven Spencer Brown* and *Denis John Conlon*, for petitioners.

*H. Barton Thomas, Jr.*, and *George W. Bezold*, for respondent.

HALPERN, *Judge*: These four cases have been consolidated for purposes of trial, briefing, and opinion. Little Salt Development Co. (Little Salt or company) is a Nebraska corporation. Petitioners were shareholders of Little Salt in 2003 until, in August, they sold their shares. Respondent determined and assessed a deficiency in Little Salt's 2003 Federal income tax of $145,923, along with an accuracy-related penalty of $58,369. Little Salt did not pay those amounts (together, unpaid 2003 tax). By separate notices of liability (notices), respondent determined that petitioners, as transferees of Little Salt's property, were liable for Little Salt's unpaid 2003 tax to the extent of the net value of the assets that each purportedly received from Little Salt.[2] Respondent calculated each petitioner's respective liability as follows:

| *Petitioner* | *Liability* |
| --- | --- |
| William Scott Stuart, Jr. ................................... | $119,609 |
| Arnold John Walters, Jr. ................................... | 59,804 |
| James Stuart, Jr. ................................................ | 59,804 |
| Robert Edwin Joyce ........................................... | 59,804 |

Petitioners assign error to respondent's determinations of their transferee liability.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect at the time of the purported transfers in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

### FINDINGS OF FACT

The parties have stipulated certain facts and the authenticity of certain documents. The facts stipulated are so found, and the documents stipulated are accepted as authentic.

---

[2] A transferee's liability generally is limited to the value of the assets received from the transferor. *See Hagaman v. Commissioner*, 100 T.C. 180 n.1 (1993).

*Petitioners*

At the time they filed the petitions, all petitioners resided in Nebraska except for William Scott Stuart, Jr. (Dr. Stuart), who resided in Minnesota. Together with the Estate of Charles Craft (which is not a party), they owned all the shares of Little Salt at the time of the stock sale discussed *infra*.

*Little Salt*

Little Salt, a so-called C corporation (subject to the tax on corporations imposed by section 11), was organized under the laws of Nebraska in 1960. It is a fiscal year taxpayer whose fiscal year ends on September 30. As of August 6, 2003, its shares were owned as follows:

| Name | Number of shares | Percentage ownership |
|------|------------------|----------------------|
| William Scott Stuart, Jr. | 20 | 33.336 |
| Robert Edwin Joyce | 10 | 16.666 |
| Arnold John Walters, Jr. | 10 | 16.666 |
| James Stuart, Jr. | 10 | 16.666 |
| Estate of Charles Craft[1] | 10 | 16.666 |

[1] Charles Craft died on June 24, 2003.

During 2003, Mr. Joyce was president of the company; Mr. Walters was both secretary and treasurer. All of Little Salt's shareholders (shareholders), other than the representative of Mr. Craft's estate, were directors.

*Land Sale*

Until June 11, 2003, Little Salt owned 160 acres of saline wetlands (land) on the outskirts of Lincoln, Nebraska. On that date, it sold the land to the City of Lincoln, Nebraska, pursuant to an assignment of contract by the Nebraska Game and Parks Commission (commission) to the city. Before its sale, the land was used for farming and for duck hunting. The land is a habitat for the Salt Creek tiger beetle, a critically endangered species. The city purchased the land for $472,000, and, after subtracting settlement charges, Little Salt received $471,111. After it sold the land (land sale), Little Salt's only asset was cash. Little Salt realized a gain of $432,148 on the land sale. After the land sale, the company did not engage in any business activity.

*Stock Sale*

During Little Salt's negotiations with the commission leading up to the land sale, one of the commission's personnel, Bruce Sackett, received a telephone call and two letters from a representative of MidCoast Investments, Inc. (MidCoast). In the first letter, MidCoast describes itself as a company interested in purchasing the stock of C corporations that have sold their assets and that, as a result, have realized a significant taxable gain. In both letters, MidCoast represents that it would purchase the Little Salt shares from the shareholders and would pay them significantly more than the shareholders would receive if they were to dissolve the company and receive the proceeds of the sale in redemption of their shares. In the second letter, MidCoast describes its post-share-acquisition plan as follows: "[U]nder MidCoast's ownership, the company will re-engineer its operations into the asset recovery business—i.e. the purchase and collection of delinquent account receivables." Mr. Sackett delivered the two letters to Mr. Joyce, Little Salt's president. Mr. Sackett had not investigated MidCoast, and he had no further contact with MidCoast after delivering the letters to Mr. Joyce.

Subsequently, by letter dated April 23, 2003, addressed to the shareholders, MidCoast proposed to acquire all of Little Salt's outstanding shares. The letter specified that the price to be paid would be "equal to the cash in the Company as of the * * * [closing date] reduced by sixty-four and 92/100 percent (64.92%) of the Company's combined state and federal corporate income tax liability for its current tax year (the 'Deferred Tax Liability')."

The letter contained an example showing net assets in Little Salt of $472,000, which, when reduced by a combined Federal and State tax liability of $171,040, resulted in a net Little Salt value of $301,788. The example added an "Asset Recovery Premium" of $60,000 to Little Salt's net value, which resulted in a price of $361,788 to be paid by MidCoast to the shareholders for their shares.

The letter also contained MidCoast's covenant "that it shall cause the Company [i.e., Little Salt] to pay the Deferred Tax Liability to the extent that the Deferred Tax Liability is due given the Company's post-closing business activities and

shall file all federal and state income tax returns on a timely basis related thereto."

All of the shareholders signed a copy of the letter, agreeing to be bound by its terms and conditions. Dr. Stuart testified that, before signing the letter, he "may have very briefly skimmed it", because he "relied on * * * [his] partners in this transaction." Mr. James Stuart, Jr. (Mr. Stuart), testified that he "probably [did] not" read it before signing it. Mr. Walters "glanced through it." Mr. Joyce testified that he is "sure that he probably did [read it]."

By mid-June 2003, the shareholders had determined to proceed with selling their shares to MidCoast (sometimes, stock sale). They retained local attorney W. Michael Morrow to represent them. Mr. Morrow was not hired to investigate MidCoast or analyze whether the stock sale was a tax shelter. His investigation of MidCoast was limited to his review of MidCoast's corporate documents. MidCoast hired local attorney W. Scott Davis to represent it.

Through July and early August 2003, Messrs. Morrow and Davis (and their clients) addressed the prerequisites for the stock sale. The share purchase agreement (agreement) identifies the purchasers as MidCoast Credit Corp. and MidCoast Acquisition Corp. (which, collectively, along with MidCoast Investments, Inc., we will also refer to as MidCoast) and provides that it is between MidCoast, Little Salt, and the shareholders. It recites that the shareholders are the owners of 100% of the shares of Little Salt and that MidCoast desires to purchase those shares from the shareholders and that the shareholders desire to sell their shares to MidCoast. It contains numerous premises, promises, representations, warranties, and covenants, among which are the following.

• MidCoast agrees to purchase from the shareholders their shares in Little Salt, and the shareholders agree to sell to MidCoast those same shares.

• The price for all of the shares is $358,826, to be paid by wire transfer to Mr. Morrow's firm's trust account.

• The combined Federal and State income tax liability of Little Salt "resulting from the sale, conveyance or other disposition of its assets and * * * [its] operations" for its current (2003) fiscal year as of the closing date "is $167,737.00 ('the Tax Liability')".

• After the closing date, it will have no liabilities other than the Tax Liability.

• MidCoast will cause Little Salt "to pay the Tax Liability, to the extent that the Tax Liability is due given the Company's post-Share Closing business activities, and shall file all federal and state income taxes on a timely basis related thereto."

• As a condition of MidCoast's obligations under the agreement, at or before the closing date, "[Little Salt] shall have transferred all of its monies (which monies shall be in an amount not less than $467,721) to * * * [Mr. Davis' firm's trust account], as Escrow Agent under a separate escrow agreement entered into on or about the date hereof."

• Governing law is the law of the State of Nebraska.

The record contains no copy of the escrow agreement referred to in the second immediately preceding paragraph, and Mr. Walters, secretary and treasurer of the company, testified that he was aware of no escrow agreement or escrow agent. On that basis, we find that there was no separate escrow agreement.

The price ($358,826) set forth in the agreement for the shares had been determined by Little Salt's accountant, David A. Ellingson. He calculated Little Salt's unpaid 2003 combined Federal and State tax liability as of June 30, 2003, to be $167,737. He determined that 64.92% of that amount was $108,895, which he subtracted from Little Salt's cash balance of $467,721, to arrive at the purchase price of $358,826.

On July 31, 2003, Mr. Davis sent to Mr. Morrow a draft letter (draft letter) regarding the exchange of funds to accomplish the closing of the stock sale. In pertinent part, the draft letter states:

At closing, your clients will cause Little Salt to transfer all of the cash in the account of Little Salt to this law firm's trust account. Purchaser will then immediately provide funds to this law firm's trust account for the entire purchase price. Upon receipt of the cash from Little Salt into this firm's trust account, this law firm will direct the purchase price be transferred to your law firm's trust account. * * * You as the representative for the individual, selling shareholders will receipt for the purchase price and make appropriate distribution of the purchase price to your clients.

Neither your law firm nor this law firm undertakes any duties of escrow agent * * *. However, both of our firms are obligated to follow

the instructions of our respective clients, and to that end, this letter is intended to memorialize the instructions we have both received in order to carry out the closing of the transaction. Under the law of Nebraska, we are fiduciaries with respect to the funds that we hold for the benefit of our clients in our respective trust accounts in any event.

On August 5, 2003, Mr. Morrow sent to Mr. Davis a letter that, among other things, discussed the cash payments. Mr. Davis was to confirm to Mr. Morrow that he had on deposit in his firm's trust account the $358,826 share purchase price and that he would transfer that amount to Mr. Morrow's firm's trust account simultaneously with Little Salt's transfer of $467,721 to Mr. Davis' firm's trust account. The letter contains language almost identical to the second quoted paragraph of the draft letter.

On August 6, 2003, MidCoast transferred $358,826 into Mr. Davis' firm's trust account.

The parties to the agreement executed it, and it was effective on, August 7, 2003. Mr. Joyce signed it as president of Little Salt. On that date, Mr. Morrow delivered instructions from Mr. Walters, Little Salt's secretary and treasurer, to Wells Fargo Bank, Little Salt's bank, instructing the bank to transfer all of its cash ($467,721) to Mr. Davis' firm's trust account. Nine minutes later, Mr. Morrow received in his firm's trust account from Mr. Davis' firm's trust account $358,826. On August 8, 2003, Mr. Morrow sent the Little Salt shareholders their pro rata shares of the $358,826 that he had received.

Little Salt's transfer of its cash to Mr. Davis' firm's trust account left it with no cash and no tangible assets.

*Disposition of Funds*

On August 7, 2003, after the receipt in his firm's trust account of $467,721 from Little Salt, Mr. Davis, at MidCoast's direction, caused that amount to be transferred to an account in the name of Little Salt at SunTrust Bank. On the next day, August 8, 2003, $467,000 was transferred from Little Salt's SunTrust Bank account to another account at that bank entitled "MidCoast Credit Corp. Accounts Payable". Little Salt recorded the August 8 transfer on its books as a receivable due from shareholder (shareholder loan). Little Salt's September 30, 2003 (yearend), balance sheet shows the amount due as $327,000, reflecting a reduction of

$140,000, apparently as credits for operating expenses and professional fees. As of January 27, 2004, Little Salt's and MidCoast's records show the balance due to Little Salt from MidCoast to be $394,429. MidCoast's files contain no promissory notes.

*Knowledge*

When on August 7, 2003, Mr. Morrow delivered Little Salt's instructions to its bank, Mr. Morrow did not know of any instructions that MidCoast may have given to Mr. Davis with respect to Little Salt's cash delivered to his trust account, nor did he know of MidCoast's plans with respect to Little Salt.

Dr. Stuart did not read the agreement before he signed it. He did not know it required Little Salt to transfer all of its money out of the corporation before the closing. He testified that he "knew nothing" about MidCoast.

Mr. Stuart testified that he could not recall ("I don't know") whether he read the agreement. He could not recall seeing the provision of the agreement that required Little Salt to transfer all of its money out of the company. He testified that he was unaware of MidCoast's promise with respect to Little Salt's tax liabilities.

Mr. Walters, Little Salt's secretary and treasurer, testified that he scanned the agreement. He was aware of MidCoast's obligation to pay the Tax Liability, but he did nothing to determine whether MidCoast would actually fulfill its obligation; he accepted its word.

Mr. Joyce, president of Little Salt, testified that he knew MidCoast was getting Little Salt's cash but, at the time of the sale, he did not know what it would choose to do with the cash. He testified that MidCoast's statement in one of the letters received from Mr. Sackett that it would re-engineer its operations into the asset recovery business meant nothing to him. He added: "I had no idea what MidCoast's intentions were with our corporation other than the little information we got from letters and their brochures about wanting to merge them into their operation. How that played into [our] operation, I didn't know and I wasn't privy to that."

*Tax Returns and Payments*

On December 15, 2003, Little Salt filed its 2003 Form 1120, U.S. Corporation Income Tax Return. It reported taxable income of $432,148, total tax of $146,930, and tax due of $148,456. It made no payment with the return. It reported on Schedule L, Balance Sheets per Books, that, as of the end of the year, it had cash of $278, a loan of $467,000 due from MidCoast, and no other assets; it reported no liabilities.

On February 18, 2005, Little Salt filed its 2004 Form 1120. It reported interest income of $1,739, apparently from the shareholder loan, a bad debt deduction of $450,370 resulting from the worthlessness of the shareholder loan, and, taking into account certain other deductions, negative taxable income of $483,970. It reported no gross receipts or cost of goods sold. The bad debt deduction produced a net operating loss that Little Salt carried back to, and deducted for, 2003. It reported on Schedule L that, as of the end of the year, it had trade notes and accounts receivable of $903 and no liabilities.

Respondent examined both Little Salt's 2003 and 2004 returns and disallowed both the 2004 bad debt deduction and the loss carried back to, and deducted for, 2003. On October 5, 2007, he determined a deficiency in Little Salt's 2003 Federal income tax of $145,923 and an accuracy-related penalty of $58,369.

The parties stipulate that Little Salt was entitled to neither deduction. Respondent issued to Little Salt a notice of deficiency within three years of February 18, 2005, the date it filed its 2004 Form 1120. Little Salt failed to timely petition the Tax Court, and, on April 21, 2008, respondent assessed the deficiency in tax and penalty that he had determined for 2003. Respondent has attempted to collect the unpaid 2003 tax from Little Salt, but he has not been successful. The amount remains unpaid.

After Little Salt failed to file Nebraska income tax returns and other required annual reports, the State of Nebraska Corporation Division placed Little Salt into inactive status on April 16, 2004.

*Notices of Transferee Liability*

Respondent sent the notices in November 2010. In an attachment to each notice respondent stated his rationale for concluding that the shareholders were transferees of Little Salt's property and liable as such for its unpaid 2003 tax. Respondent explained that he would recast the transaction by which the shareholders disposed of their shares in Little Salt as he saw the substance of the transaction; i.e., not as the shareholders' sale of those shares to MidCoast, but rather, as a liquidating distribution of all of Little Salt's cash to its shareholders in redemption of its outstanding shares, followed by the shareholders' payment of a portion of that cash to MidCoast as an accommodation fee for its participation in the assumed sale.

*Petitions*

Petitioners timely petitioned for review of the notices, each assigning as error respondent's determinations that (1) Little Salt had a deficiency in tax for 2003 of $145,923 and incurred an accuracy-related penalty of $58,369 and (2) petitioners are liable as transferees of Little Salt's assets. Each also raised as an affirmative defense that the period of limitations for assessing transferee liability had run when the notices were sent. Respondent denied petitioners' assignments of error and defense.

OPINION

## I. *Introduction*

We must determine whether petitioners are liable as transferees of the property of Little Salt for the unpaid 2003 tax. Although petitioners assign as error respondent's determination of the unpaid 2003 tax, they make no objection on brief to respondent's proposed finding of fact that Little Salt is liable for the unpaid 2003 tax. We think that there is ample evidence to support that proposed finding, and we so find. On that basis, there is no merit to petitioners' first assignment of error. That leaves for discussion petitioners' affirmative defense of the period of limitations and their remaining assignment of error, that they are not liable as transferees of Little Salt's property. We will address those issues in turn.

II. *Period of Limitations*

In general, the Commissioner must assess transferee liability within one year after expiration of the period of limitations on the transferor. *See* sec. 6901(c). The applicable period of limitations may be extended by agreement. *See* sec. 6901(d). When a petition is filed with the Court with respect to a notice of transferee liability, the running of the period of limitations is further suspended, from the date of mailing of the notice until 60 days after the decision of the Court becomes final. *See* sec. 6901(f). The period of limitations on assessment and collection of tax with respect to the transferor is set forth in section 6501. Pursuant to section 6501(h), a deficiency attributable to a net operating loss carryback may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the loss that results in the carryback may be assessed. The bar of the statutory period of limitations is an affirmative defense, and the party raising this defense must specifically plead it and prove it. *See* Rules 39, 142(a); *Amesbury Apartments, Ltd. v. Commissioner*, 95 T.C. 227, 240 (1990).

Respondent has set forth a chain of events, including extensions by the shareholders pursuant to section 6901(d)(1) of the section 6901(c) period of limitations, that appears to belie petitioners' claim that the period of limitations for assessing transferee liability had run when the notices were sent. Petitioners' only argument is that if, pursuant to respondent's theory in the notices, the shareholders on August 7, 2003, received distributions in liquidation of their Little Salt shares then, thereafter, "[Little Salt] could no longer exist for purposes of filing a tax return for the year ended September 30, 2004 (claiming a net operating loss carried back to the prior year) to extend the statute of limitations for the year ended September 30, 2003 under I.R.C. § 6501(h)."

Petitioners are mistaken in their understanding of a corporation's obligation to file a Federal income tax return. "A corporation in existence during any portion of a taxable year is required to make a return." Sec. 1.6012–2(a)(2), Income Tax Regs. Moreover: "For Federal income tax purposes, the annulment of a corporation's charter does not necessarily have the effect of discontinuing the corporate entity. * * * If

a corporation retains assets, even though under State law its legal existence has been terminated and the corporation is in the process of liquidation, it will be treated as a continuing taxable entity." *Hill v. Commissioner*, 66 T.C. 701, 705 (1976); *see also* sec. 1.6012–2(a)(2), Income Tax Regs.[3] If a corporation is in the process of liquidation and if its "affairs are substantially unsettled, it will remain in existence for Federal income tax purposes." *Hill v. Commissioner*, 66 T.C. at 705. There is evidence here of Little Salt's activities through at least early 2005, when it filed its 2004 Form 1120 and claimed a loss that it carried back to, and claimed for, 2003. Even crediting respondent's theory that a liquidating distribution was made, petitioners have failed to carry their burden of showing that Little Salt's existence discontinued or its obligation to make a Federal income tax return ended before February 18, 2005, when it filed its 2004 Form 1120.

Petitioners' affirmative defense relying on the statutory period of limitations as a bar to respondent's collection of transferee liability from them fails.

## III. *Transferee Liability*

### A. *Introduction*

Section 6901 provides that the liability, at law or in equity, of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred". By way of illustration, but not by way of limitation, section 6901(h) provides that the term "transferee" includes "donee, heir, legatee, devisee, and distributee".

While the definition of persons considered transferees for purposes of section 6901 is extensive, the section does not independently impose tax liability upon a transferee but provides a procedure through which the Commissioner may col-

---

[3] Under Nebraska law, the secretary of state is directed automatically to dissolve a corporation subject to the State's Business Corporation Act that does not timely pay its occupation (franchise) tax and file the required reports. *See* Neb. Rev. Stat. Ann. sec. 21–323 (LexisNexis 2008). Nevertheless, a corporation subject to such automatic dissolution "continues its corporate existence" as necessary to wind up and liquidate its business and affairs. *Id.*

lect unpaid taxes owed by the transferor of the property from a transferee if an independent basis exists under applicable State law or State equity principles or, in some cases, Federal law for holding the transferee liable for the transferor's debts. *See Commissioner v. Stern*, 357 U.S. 39, 45 (1958); *Hagaman v. Commissioner*, 100 T.C. 180, 183 (1993). Thus, usually, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as a means of enforcing that liability. *See Swords Trust v. Commissioner*, 142 T.C. 317, 335–336 (2014). The Commissioner bears the burden of proving that the transferee is liable as a transferee of property of the taxpayer but need not prove that the taxpayer was liable for the tax. Sec. 6902(a); Rule 142(d).

A transferee's liability for Federal taxes of the transferor of property includes any additions to tax, penalties, and interest that have been assessed with respect to the tax. *See Kreps v. Commissioner*, 42 T.C. 660, 670 (1964), *aff'd*, 351 F.2d 1 (2d Cir. 1965). Transferee liability is several, and the Commissioner is free to proceed against one or more of any number of potential transferees. *See Phillips v. Commissioner*, 283 U.S. 589, 603–604 (1931).

### B. *Applicable State Law*

#### 1. *Uniform Fraudulent Transfer Act*

The existence and extent of transferee liability is determined by the law of the State where the transfer occurred. *Estate of Miller v. Commissioner*, 42 T.C. 593, 598 (1964); *see Commissioner v. Stern*, 357 U.S. at 45. In these consolidated cases, that State is Nebraska. Nebraska has adopted the Uniform Fraudulent Transfer Act (UFTA), Neb. Rev. Stat. Ann. secs. 36–701 through 36–712 (LexisNexis 2014), which provides creditors with certain remedies, including avoidance, when a debtor makes a fraudulent transfer. *See id.* sec. 36–708(a)(1). If avoidance of a transfer is established, a creditor, subject to certain limitations, may recover judgment for the value of the asset transferred, or the amount necessary to satisfy the creditor's claim, whichever is less. *Id.* sec. 36–709(b). The judgment may be entered against:

> (1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

[*Id.*]

Neb. Rev. Stat. Ann. sec. 36–705(a) establishes when a transfer is fraudulent as to present and future creditors:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Neb. Rev. Stat. Ann. sec. 36–706 establishes when a transfer is fraudulent only as to present creditors:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider knew or reasonably should have known that the debtor was insolvent.

Fraud under UFTA may be either actual or constructive.[4] The term "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliqui-

---

[4] Neb. Rev. Stat. Ann. sec. 36–705(a)(1) (LexisNexis 2014) concerns itself with "actual" fraud, requiring a creditor to show the debtor's intent, i.e., that he "made the transfer * * * with *actual intent to hinder, delay, or defraud any creditor* of the debtor." (Emphasis added.) Neb. Rev. Stat. Ann. secs. 36–705(a)(2) and 36–706(a), on the other hand, are essentially unconcerned with intent and focus, instead, on economic effect, e.g., whether the creditor received "a reasonably equivalent value in exchange for the transfer". Such intentless fraud is generally described as "constructive" fraud. *See, e.g.*, *Wiand v. Lee*, 753 F.3d 1194, 1199 (11th Cir. 2014); *Cullifer v. Commissioner*, T.C. Memo. 2014–208, at *49–*51.

dated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* sec. 36–702(3).

"Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." *Id.* sec. 36–704(a).

A debtor is considered "insolvent" under UFTA "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." *Id.* sec. 36–703(a). The term "debt" means "liability on a claim." *Id.* sec. 36–702(5). With exceptions not here relevant, the term "asset" means "property of a debtor". *Id.* sec. 36–702(2).

The burden is on the creditor to prove by clear and convincing evidence the elements necessary to show that a transfer made by a debtor is fraudulent as to the creditor. *See Dillon Tire, Inc. v. Fifer*, 589 N.W.2d 137, 142 (Neb. 1999).

An action under UFTA to declare a transfer fraudulent as to a creditor invokes equity jurisdiction of a court. *See id.* at 141.

### 2. *Nebraska Business Corporation Act*

The Nebraska Business Corporation Act provides that claims against a dissolved corporation may in some circumstances and with limitations be enforced against the corporation's shareholders when corporate assets have been distributed in liquidation. *See* Neb. Rev. Stat. Ann. sec. 21–20,157(4) (LexisNexis 2008 & Supp. 2014).

### 3. *Trust Fund Doctrine*

Under the common law trust fund doctrine, "property of the corporation constitutes a trust fund in the hands of its officers and directors, and a transaction between them whereby the corporation's property is diverted from the corporation to their own use and benefit will not be upheld." *Elec. Dev. Co. v. Robson*, 28 N.W.2d 130, 139 (Neb. 1947).

C. *Parties' Arguments*

1. *Respondent's Arguments*

a. *Two-Step Analysis*

Respondent argues that, in determining whether, pursuant to section 6901, he may use administrative procedures to collect Little Salt's unpaid 2003 tax liability from petitioners, we should engage in a two-step analysis.

> First, the court should determine under federal law whether the transaction that gives rise to the liability was properly characterized and whether the recipient was a transferee under section 6901(h). Once that analysis is done, if the transaction is recast or otherwise disregarded under federal tax law principles and the recipient is a transferee, then the court should look to state law to determine whether the transferees received fraudulent transfers.

To make the first step (i.e., to determine the proper character of the transaction and to determine whether the shareholders are transferees within the meaning of section 6901), respondent argues that we must disregard the form chosen by the shareholders to liquidate their investments in Little Salt (i.e., a sale of shares to MidCoast) and consider, instead, the substance of the transaction. Respondent views that substance as follows: "The Little Salt shareholders are each transferees of cash from Little Salt because the Stock Sale was in substance a shareholder distribution of cash to them followed by payment of a fee or commission to MidCoast." In support of his argument that substance should govern over form, respondent invokes many familiar doctrines pertinent to interpretation of the Internal Revenue Code (Code), along with supporting authority.

> Taxpayers generally are free to structure their business transactions as they wish, even if motivated in part by tax reduction considerations. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 (1983), *affd. on this issue* 752 F.2d 89 (4th Cir. 1985).
>
> However, a transaction that lacks economic purpose and substance other than sought-after tax avoidance may be treated as a sham and disregarded for federal income tax purposes. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 196. The economic substance of a transaction, rather than its form, controls. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465; *Amdahl Corp. v. Commissioner*, 108 T.C. 507, 516–17 (1997).

The "labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction." *Houchins v. Commissioner*, 79 T.C. 570, 589 (1982).

For Federal income tax purposes a transaction may be disregarded if the transaction was not entered into for valid business purposes but rather for "tax benefits not contemplated by a reasonable application of the language and purpose of the Code or its regulations." *Feldman v. Commissioner*, T.C. Memo. 2011–297 slip op. at 27 (quoting *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009–288). Even if a transaction is not treated as a sham, it still may be recast in order to reflect its true nature. *Gaw v. Commissioner*, T.C. Memo. 1995–531.

As respondent sees it, the simultaneous exchange of funds by Little Salt to MidCoast, and by MidCoast to the shareholders, through Mr. Davis' firm's trust fund, followed by MidCoast's transitory deposit of the funds received from Little Salt into a new Little Salt bank account before their return to MidCoast in exchange for its worthless promise to repay Little Salt served no purpose but to put most of Little Salt's cash into the hands of the shareholders and, in exchange for a fee paid to MidCoast, to give them a plausible basis to deny that they were transferees of the company's property. As respondent puts it:

The Stock Sale is a subterfuge. In reality, it is nothing but a liquidation of Little Salt and a distribution of its assets to its shareholders making them transferees liable for Little Salt's income tax liability.

\*   \*   \*   \*   \*   \*   \*

Little Salt had ceased all business operations as of the Asset Sale. \* \* \* There being no business, there was no apparent business reason for the Stock Sale. In effect, \* \* \* the parties simply exchanged unequal amounts of fungible cash, and the difference represented MidCoast's fee for assisting the Little Salt shareholders in avoiding the incidence of Little Salt's deferred tax liability.

b. *Equitable Rules*

Even were we to disregard antiabuse doctrines pertinent to interpreting the Code, respondent believes that we would reach the same result by applying the equitable rules pertinent to considering fraudulent transfer claims. *See Dillon v. Fifer*, 589 N.W.2d at 141 ("Equity looks through forms to substance. Thus, a court of equity goes to the root of the matter and is not deterred by forms."); *see also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("'[F]raudulent conveyance doctrine . . . is a flexible principle

that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights[.]'" (quoting Douglas G. Baird, Elements of Bankruptcy 153–154 (4th ed. 2006))).

c. *State Law Liability*

With respect to his satisfying the second step, i.e., showing State law liability, respondent cites the following bases under which he may collect Little Salt's unpaid tax and penalty from petitioners: (1) under the Nebraska Business Corporation Act, as a claimant against a dissolved corporation's shareholders having received corporate assets in a liquidating distribution, (2) under UFTA, on account of the distributions' being fraudulent as to him within the meaning of Neb. Rev. Stat. Ann. sec. 36–705(a)(2) or 36–706(a), or (3) under the trust fund doctrine.

Additionally, if we are to respect the form of the stock sale (and likewise the transfer by Little Salt of its cash to MidCoast), respondent argues that, nonetheless, the transfer to MidCoast was fraudulent as to him, and, pursuant to Neb. Rev. Stat. Ann. sec. 36–709(b)(1), he is entitled to a judgment against the shareholders, "the person[s] for whose benefit the transfer was made."

2. *Petitioners' Arguments*

Petitioners view the facts as follows:

   Little Salt sold land that it owned in Nebraska on June 11, 2003. It received proceeds from the sale which it deposited into its bank account. The Petitioners thereafter each sold their stock in Little Salt to MidCoast on August 7, 2003. At that time, and immediately thereafter, Little Salt had $467,721 on hand at the bank. Thus, Little Salt was solvent prior to, during and after the stock sale.

Petitioners' argument rejecting any liability under UFTA appears to proceed as follows. Little Salt's proceeds from the land sale remained with it until the shareholders sold their shares to MidCoast on August 7, 2003. Therefore, notwithstanding that at some time thereafter Little Salt may have made a transfer fraudulent as to respondent, no judgment can be entered against them under Neb. Rev. Stat. Ann. sec. 36–709(b)(1) since none of the proceeds from the land sale were ever transferred to them. As they put in their answering brief: "As established in the Petitioner's [sic]

Opening Brief, there can be no transferee liability under
* * * [UFTA]. Most importantly, there were no transfers
from Little Salt to the Petitioners". For the same reason,
they believe that they cannot be held liable for Little Salt's
tax debts under the Nebraska Business Corporation Act or
the trust fund doctrine.

They reject respondent's attempt to recharacterize the
stock sale as a payment by Little Salt to them of cash in
redemption of their shares. They add that the shareholders
did not have the "requisite knowledge" (i.e., "that the Little
Salt taxes would not be paid by MidCoast") to support re-
characterizing the stock sale.

D. *Discussion*

1. *Two-Step Analysis*

Recently, in *Swords Trust v. Commissioner*, 142 T.C. 317,
we faced another situation in which the shareholders of a
corporation with a large unpaid Federal income tax liability
had sold their shares. In furtherance of collecting the unpaid
liability from the shareholders as transferees of the corpora-
tion's property, the Commissioner sought to recharacterize
the stock sale as a liquidating distribution in which the
shareholders received cash in redemption of their shares. The
Commissioner argued for the same two-step analysis that he
argues for here. Previously, we had not explicitly adopted or
rejected that analysis although our approach had been to
recast a transaction only when State law allowed such re-
casting. *Id.* at 340. Three U.S. Courts of Appeals had rejected
the Commissioner's two-step analysis. *See Diebold Found.,
Inc. v. Commissioner*, 736 F.3d 172, 184–185 (2d Cir. 2013),
*vacating and remanding* T.C. Memo. 2012–61, 2012 WL
716191; *Sawyer Trust of May 1992 v. Commissioner*, 712
F.3d 597, 604–605 (1st Cir. 2013), *rev'g and remanding* T.C.
Memo. 2011–298; *Starnes v. Commissioner*, 680 F.3d 417,
428–429 (4th Cir. 2012), *aff'g* T.C. Memo. 2011–63, 2011 WL
894608.[5] We found that the rationales of the three decisions

_____

[5] Since we decided *Swords Trust v. Commissioner*, 142 T.C. 317 (2014),
the U.S. Court of Appeals for the Ninth Circuit has joined its three sisters
in rejecting the Commissioner's two-step analysis. *See Salus Mundi Found.
v. Commissioner*, 776 F.3d 1010 (9th Cir. 2014), *rev'g and remanding* T.C.
Memo. 2012–61. In *Feldman v. Commissioner*, 779 F.3d 448, 454 (7th Cir.

Continued

were similar, typified by the rationale of the Court of Appeals for the Fourth Circuit in *Starnes*. *Swords Trust v. Commissioner*, 142 T.C. at 338–340. In *Starnes v. Commissioner*, 680 F.3d at 428–429, the court, citing *Commissioner v. Stern*, 357 U.S. 39, held that the question of whether a person or an entity is a "transferee" for purposes of section 6901 is separate from the question of whether the transfer was fraudulent for State law purposes. It concluded that "*Stern* forecloses the Commissioner's efforts to recast transactions under federal law before applying state law to a particular set of transactions." *Starnes v. Commissioner*, 680 F.3d at 429. We held in *Swords Trust v. Commissioner*, 142 T.C. at 338, that, like the three Courts of Appeals, we would reject the Commissioner's two-step analysis.

Our holding in *Swords Trust* on that point is controlling, and, for that reason, we need say no more. Nevertheless, because in this Court and in other courts, *see, e.g.*, *Salus Mundi Found. v. Commissioner*, 776 F.3d 1010 (9th Cir. 2014), *rev'g and remanding* T.C. Memo. 2012–61, the Commissioner persists in his two-step analysis, we offer an additional reason for rejecting that analysis. Before the enactment of the original predecessor provision to section 6901, the rights of the Federal Government as creditor of a tax debt were enforceable against someone other than the taxpayer only through procedures cumbersome in comparison to the summary administrative remedy allowed against the taxpayer himself. [6] The purpose of the change in the law was to provide for the enforcement of such third-party liability to the Government by the procedures already in existence for the enforcement of tax deficiencies. H.R. Conf. Rept. No. 69–356, at 43 (1926), 1939–1 C.B. (Part 2) 361, 371. The proce-

---

2015), *aff'g* T.C. Memo. 2011–297, the Court of Appeals for the Seventh Circuit concluded that transferee liability cases under sec. 6901 proceed in two steps: first, the Commissioner must establish that the target is a transferee within the meaning of sec. 6901; second, he must establish the transferee's liability under State law. The court acknowledged that the independent State law inquiry would make a difference in outcome when there was a conflict between the applicable Federal doctrine (applying antiabuse doctrines to restructure a transaction) and the State law that determines substantive liability, but it found no such conflict on the facts before it. *Id.* at 458.

[6] *See* Michael I. Saltzman & Leslie Book, IRS Practice and Procedure, para. 17.01, at 17–3 through 17–4 (rev. 2d ed. 2002).

dures were to be effective against a transferee of property of the taxpayer, but "[w]ithout in any way changing the extent of such liability of the transferee under existing law". *Id.* at 43, 1939–1 C.B. (Part 2) at 371. Moreover, notwithstanding Congress' enactment of a summary method for collecting a transferee's liability, section 6901 is *not* the exclusive method for the Commissioner to collect a transferee's liability. For example, the section does not replace the older judicial remedies of instituting proceedings to collect a corporate tax from its shareholders or to set aside a fraudulent conveyance. *See, e.g.*, *Leighton v. United States*, 289 U.S. 506 (1933) (equity suit to compel shareholders to account for corporate property to satisfy corporation's tax liability not foreclosed by failure to employ (now section 6901) collection authority); *United States v. Russell*, 461 F.2d 605 (10th Cir. 1972) (expiration of section 6901(c) period of limitations to assess section 6901(a) transferee liability is no bar to civil action in debt to collect estate tax from surviving joint tenant); *United States v. Estate of Kime*, 950 F. Supp. 950 (D. Neb. 1996) (executor's personal liability for estate tax imposed pursuant to 31 U.S.C. sec. 3713(b); fraudulent conveyances of property necessary to satisfy tax debt set aside under UFTA).[7] Nothing in section 6901 accords the Commissioner any right not enjoyed by other creditors seeking to use the judicial enforcement mechanisms if the Commissioner proceeds outside of section 6901 to set aside a fraudulent transfer or to enforce against a transferee of property the transferor's liability for tax. And if the Commissioner so proceeds, the question of whether the person against whom the Commissioner proceeds is a transferee within the meaning of section 6901 is moot. Section 6901 merely identifies those persons (transferees of property) against whom the Commissioner may

---

[7] In Saltzman & Book, *supra*, para. 17.01, at 17–6, the authors add:

Similarly, the Service may institute an action to collect a fiduciary's liability under 31 USC § 3713. The transferee may also be held liable for the debts of the debtor under the Bankruptcy Code, which has its own fraudulent conveyance statute,[15] even if the issue of liability is decided in the bankruptcy court, not the Tax Court, under Section 6901. [The second comma in the second to the last line (which appears in the original) appears to be an error. The final phrase of the sentence likely should read: "not the Tax Court under Section 6901."]

[15] 11 USC § 548.

employ the summary collection authority afforded to him by section 6901(a) once, independent of that section, he has fixed the person's substantive liability under State or Federal law as a transferee of the taxpayer's property. If without invoking section 6901 he could not fix that liability, then he cannot resort to his summary collection authority to obtain a different result. That is what is implied by the Supreme Court's statements in *Commissioner v. Stern*, 357 U.S. at 44, that the predecessor of section 6901 was "purely a procedural statute" and "we must look to other sources for definition of the substantive liability."

Notwithstanding our rejection of respondent's two-step analysis, for the reasons that follow we agree that respondent may proceed pursuant to section 6901 to summarily collect some of Little Salt's 2003 unpaid tax from petitioners.

### 2. *Liability Under UFTA*

#### a. *Introduction*

On August 7, 2003, Little Salt transferred all of its cash to Mr. Davis' firm's trust account (sometimes, transfer). Respondent argues that Little Salt, a debtor, made the transfer "without receiving a reasonably equivalent value in exchange for the transfer", which, pursuant to Neb. Rev. Stat. Ann. secs. 36–705(a)(2) and 36–706(a), was constructively fraudulent with respect to him, a creditor of Little Salt's. Respondent makes no claim that Little Salt made the transfer "with actual intent to hinder, delay, or defraud" respondent, so as to cause the transfer to be actually fraudulent with respect to respondent and to bring into play Neb. Rev. Stat. Ann. sec. 36–705(a)(1). Principally, respondent relies on Neb. Rev. Stat. Ann. sec. 36–706(a).

#### b. *Neb. Rev. Stat. Ann. Sec. 36–706(a)*

#### i. *Introduction*

A transfer is fraudulent with respect to a creditor within the meaning of Neb. Rev. Stat. Ann. sec. 36–706(a) where (1) the creditor's claim arose before the transfer, (2) the transferor does not receive "a reasonably equivalent value in exchange for the transfer", and (3) the transferor was insolvent as a result of the transfer.

ii. *When the Claim Arose*

Little Salt received $471,111 from the land sale and, on August 7, 2003, transferred $467,721 to Mr. Davis' firm's trust account. On that date, the shareholders sold their shares in Little Salt to MidCoast for $358,826, a price determined by subtracting from the amount of Little Salt's cash in the bank 64.92% of the company's combined 2003 Federal and State tax liability. Mr. Ellingson, Little Salt's accountant, had determined that, as of June 30, 2003, Little Salt's estimated combined 2003 Federal and State tax liability was $167,737. Little Salt's 2003 tax year ended on September 30, 2003. It filed its 2003 Form 1120 on December 15, 2003, showing a tax due of $148,456. It did not pay that amount, and, on October 5, 2007, respondent determined a deficiency in Little Salt's 2003 income tax of $145,923.

The term "claim" is expansively defined for purposes of UFTA. It means "a right to payment" and includes, among others, a right to payment "whether or not * * * reduced to judgment," "contingent," or "unmatured." Neb. Rev. Stat. Ann. sec. 36–702(3). Many years ago, we said: "[T]ransferee liability extends to after-accruing taxes in the sense of retroactive liability for taxes in the year of transfer or prior years. In other words, the liability need not have been known when the transfer was made." *Wyche v. Commissioner*, 36 B.T.A. 414, 419 (1937); *see also Scott v. Commissioner*, 117 F.2d 36, 38 (8th Cir. 1941), *aff'g* 1939 WL 12120 (B.T.A.); 14A Mertens Law of Federal Income Taxation, sec. 53.40 (2014) ("A transferee is retroactively liable for the transferor's taxes in the year of the transfer and also prior years, to the extent of the assets received from the transferor. This rule applies even where the transferor's tax liability was unknown at the time of the transfer."). In *Estate of Glass v. Commissioner*, 55 T.C. 543, 574–575 (1970), *aff'd per curiam*, 453 F.2d 1375 (5th Cir. 1972), we rejected the taxpayer-transferee's argument that the corporate transferor's tax liability for the year in which the transfer occurred could not be calculated and, thus, did not accrue, until the corporation's yearend since, hypothetically, after the transfer, the corporation could have incurred losses that would have reduced its tax liability. We relied on the rule that "tax liability accruing at the end of the taxable year in which the transfer occurred must be

considered in determining the transferor corporation's solvency immediately after the transfer." *Id.* at 575; *see also LR Dev. Co., LLC v. Commissioner*, T.C. Memo. 2010–203, 2010 WL 3604164, at *44 ("Even if during its short taxable year ended December 31, 2000, * * * [transferor] might have engaged in additional transactions or activities that might have reduced or eliminated the tax attributable to * * * [its] sale of certain of its assets to petitioner, that tax nonetheless was a contingent liability as of and immediately after that sale." (citing Illinois UFTA)).

The cited cases are authority principally with respect to determining whether the transferor's tax liability for the year of the transfer should be considered in determining whether the transferor was insolvent at the time of the transfer or was made insolvent by the transfer. They are not specifically authority with respect to the meaning of the term "claim" in Neb. Rev. Stat. Ann. sec. 36–702(3). Nevertheless, the term "insolvency" means "[t]he condition of being unable to pay debts as they fall due". Black's Law Dictionary 867 (9th ed. 2009); *see also* Neb. Rev. Stat. Ann. sec. 36–703(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). And the term "debt" means "[l]iability on a claim". Black's Law Dictionary 462; *accord* Neb. Rev. Stat. Ann. sec. 36–702(5). Thus, the determination that a debtor is insolvent subsumes the conclusion that his debts involve claims. We are satisfied on the basis of the authority that we have cited that, because, generally, unmatured tax liabilities are taken into account in determining a debtor's solvency, they are "claims" and should be treated as such under the expansive definition of the term "claim" in Neb. Rev. Stat. Ann. sec. 36–702(3).[8] *See United States v. Exec. Auto Haus, Inc.*, 234 F. Supp. 2d 1253, 1257

---

[8] Moreover, under Uniform Fraudulent Transfer Act (UFTA) sec. 1 cmt. at 10 (1984) the definition of the term "claim" for purposes of UFTA sec. 1(3) is derived from sec. 101(4) of the Bankruptcy Code, Pub. L. No. 95–598, sec. 101(4), 92 Stat. at 2550. S. Rept. No. 95–989 (1978), 1998 U.S.C.C.A.N. 5787, accompanied H.R. 8200, 95th Cong. (1978), which, as enacted, became Pub. L. No. 95–598. The Senate report states with respect to the definition of the term "claim" that the term is defined in the broadest possible sense, contemplating "all legal obligations of the debtor, no matter how remote or contingent". S. Rept. No. 95–989, *supra* at 22, 1998 U.S.C.C.A.N. at 5807.

(M.D. Fla. 2002) (finding, with reference to Florida equivalent to Neb. Rev. Stat. Ann. sec. 36–706(a), that Government's claim could be deemed to have arisen, even if taxpayer was unaware of its tax liability at time of transfer).

On August 7, 2003, the day of the transfer, respondent had, within the meaning of Neb. Rev. Stat. Ann. sec. 36–702(3), a claim against Little Salt for unpaid taxes.

### iii. *Reasonably Equivalent Value*

Little Salt was a party to the agreement, and on August 7, 2003, pursuant to the agreement, it transferred $467,721 to Mr. Davis' firm's trust account.

We must determine whether, in exchange for the transfer, Little Salt received reasonably equivalent value. *See* Neb. Rev. Stat. Ann. sec. 36–706(a). In relevant part, Neb. Rev. Stat. Ann. sec. 36–704(a) provides that value is given for a transfer "if, in exchange for the transfer * * *, property is transferred". Value, however, does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or to another. *Id.*

Pursuant to the agreement, MidCoast covenanted to cause Little Salt to pay the Tax Liability (a defined term), "to the extent that the Tax Liability is due given the Company's post-Share Closing business activities". And while that covenant was executory, it is not for that reason excluded from the statute's definition of value since it was not an unfilled promise to furnish support to any person. *See Gardner v. Tyson (In re Gardner)*, 218 B.R. 338, 346–347 (Bankr. E.D. Pa. 1998) (only type of unperformed promise that does not constitute value, as a matter of law (under Pennsylvania UFTA) is an unfulfilled promise to furnish support to the debtor or another person); *Manchec v. Manchec*, 951 So. 2d 1026, 1028–1029 (Fla. Dist. Ct. App. 2007) (promise of future royalties was not an unperformed promise excepted from the Florida UFTA definition of value because it was not a promise of support); *see also* UFTA sec. 3 cmt. at 16–17 (1984) (act adopts view of cases interpreting Uniform Fraudulent Conveyance Act that, in a variety of circumstances, an executory promise (other than some promises of support) constitutes value).

The agreement defines the Tax Liability as Little Salt's combined Federal and State income tax liability resulting from the land sale and its operations to the closing date, amounting to $167,737. Whatever value we might assign to MidCoast's covenant to cause Little Salt to pay that amount (or some lesser amount if Little Salt incurred 2003 post-closing-date tax losses), that value could not exceed $167,737, which is far from being substantially equivalent to the $467,721 that Little Salt transferred to Mr. Davis' firm's trust account. Also, pursuant to the agreement, MidCoast did pay to the shareholders $358,826. The general rule, however, is that a debtor does not receive reasonably equivalent value if it makes a transfer in exchange for a benefit to a third party. *E.g.*, *Official Comm. of Unsecured Creditors of Crystal Med. Prods., Inc. v. Pedersen & Houpt (In re Crystal Med. Prods., Inc.)*, 240 B.R. 290, 300 (Bankr. N.D. Ill. 1999). Little Salt did not receive value reasonably equivalent to the $467,721 that it transferred to Mr. Davis' firm's trust account on account of MidCoast's purchase of the shareholders' shares.

Petitioners' argument is that "Little Salt did not transfer anything pursuant to the Stock Sale." That, of course, is *not* what the agreement says. Petitioners continue, however: "[Little Salt] had $471,221 in the bank both before and after the transaction." Petitioners cite in support of that proposition *Starnes v. Commissioner*, T.C. Memo. 2011–63. Apparently, petitioners want us to find that Little Salt received substantially equivalent value for the transfer because, at the direction of MidCoast, Mr. Davis transferred $467,721 to a new Little Salt account, where the funds sat for one day before being returned to MidCoast. In *Starnes*, Tarcon (a corporation) sold all of its assets for cash. Two weeks later, its shareholders sold their shares to MidCoast for a price determined in a manner similar to how the price for Little Salt's shares was determined. Before the closing, the Tarcon shareholders transferred all of Tarcon's cash to MidCoast's attorney's trust account. The closing statement showed a disbursement of an equal amount from that account to a "'post-closing' bank account" of Tarcon's. The Commissioner argued that Tarcon received nothing because the share purchase agreement between the Tarcon shareholders and MidCoast did not specifically identify a money transfer to

Tarcon with respect to the sale. While the Tarcon shareholders and MidCoast may not have specifically agreed to a postclosing return of Tarcon's cash to it, we found that the closing statement evidenced such an intent. *Id.*, 2011 WL 894608, at *8. Indeed, in affirming our Memorandum Opinion, the Court of Appeals stated: "There was substantial evidence that the Former Shareholders expected the funds to be transferred back to Tarcon, as of course they were within a day of the closing." *Starnes v. Commissioner*, 680 F.3d at 432 n.9.

Here the agreement is silent as to the disposition of Little Salt's funds deposited into Mr. Davis' firm's trust account. Although the agreement specifies that the funds are transferred to Mr. Davis' law firm "as escrow agent under a separate * * * agreement entered into on or about the date hereof", there was no escrow agreement. Mr. Walters, secretary and treasurer of the company, testified that he was aware of no escrow agreement or escrow agent. Moreover, in correspondence between Mr. Morrow (the shareholders' and Little Salt's attorney) and Mr. Davis (MidCoast's attorney), each makes it clear that neither thought either's law firm was undertaking any duties as an escrow agent. Nor is there here a closing statement available to all parties to the agreement showing a disbursement of Little Salt's cash to a new Little Salt account and from which we might assume Little Salt's and the shareholders' knowledge of and agreement to such a transfer. Indeed, the contrary is the case here. Mr. Davis' draft letter of July 31, 2003, states that, in part, its purpose is to memorialize his instructions received from MidCoast, but it contains no instruction with respect to the disposition of Little Salt's cash. Mr. Morrow did not know of any instructions that MidCoast may have given Mr. Davis with respect to Little Salt's cash delivered to his trust account, nor did he know of MidCoast's plans with respect to Little Salt. Mr. Joyce, president of Little Salt, who signed the agreement for the company, testified that he knew MidCoast was getting Little Salt's cash but, at the time of the sale, he did not know what it would choose to do with the cash.

Whatever instructions MidCoast gave Mr. Davis with respect to his disposition of the Little Salt funds received into his firm's trust account, those instructions and MidCoast's intended disposition of the funds were unknown

to Little Salt and to its shareholders on August 7, 2003, when they entered into the agreement. Unlike the facts found in *Starnes v. Commissioner*, T.C. Memo. 2011–63, the record here does not support the conclusion that the shareholders expected MidCoast to transfer the Little Salt funds back to it. And while MidCoast did cause Mr. Davis to redeposit those funds into a new Little Salt bank account at Sun Trust Bank (where they remained overnight), MidCoast was not obligated by the agreement to do so. MidCoast's transfer was gratuitous, in the sense that it was voluntary and not in consideration of the shareholders' or Little Salt's performances under the agreement. In *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002), where one question was whether value was received for purposes of section 160/4(a) of Illinois UFTA, 740 Ill. Comp. Stat. 160/(4)(a) (West 2010), the court said: "[W]e think the inquiry should stop at the first stage of analysis, that is, should stop after it is determined that the transfer was not supported by consideration. If it was gratuitous, the fact that some or for that matter all of it may later have seeped back to the debtor does not legitimize the transfer."

Little Salt did not receive reasonably equivalent value on account of the transfer. *See* Neb. Rev. Stat. Ann. sec. 36–706(a).

### iv. *Insolvency*

Respondent argues that Little Salt became insolvent upon its transfer of all its cash (its only asset) to Mr. Davis' firm's trust account: "As its liabilities exceeded its assets (which were then zero) Little Salt was rendered insolvent immediately before petitioners purportedly sold their shares." Petitioners answer: "Little Salt had cash in the bank in the amount of $467,221 [sic] both before and after the Stock Sale, more than sufficient to pay the tax liability in question."

A debtor is insolvent under UFTA "if the sum of * * * [its] debts is greater than all of * * * [its] assets at a fair valuation." *Id.* sec. 36–703(a).[9] Insolvency is determined at the

_____

[9] The test of Neb. Rev. Stat. Ann. sec. 36–701(a) is a balance sheet test (if debts exceed assets, equity is negative). In addition, Neb. Rev. Stat. Ann. sec. 36–703(b) contains a rebuttable presumption that a debtor that is generally not paying its debts as they become due is insolvent. Since we

time of the allegedly fraudulent transfer. *See id.* sec. 36–706(a); *see also, e.g.*, *Phongsisattanak v. Blue Heron, Inc. (In re Phongsisattanak)*, 353 B.R. 594, 598–599 (B.A.P. 8th Cir. 2006). Following the transfer, Little Salt faced an estimated liability of $167,737 for combined unpaid 2003 Federal and State income taxes. That estimated liability constituted a claim within the meaning of Neb. Rev. Stat. Ann. sec. 36–702(3), *see* discussion *supra* pp. 256–259, and, for that reason, it constituted a debt for purposes of determining whether, on account of the transfer, Little Salt became insolvent within the meaning of Neb. Rev. Stat. Ann. sec. 36–703(a). *See* Neb. Rev. Stat. Ann. sec. 36–702(5) ("Debt means liability on a claim."); *e.g.*, *LR Dev. Co., LLC v. Commissioner*, 2010 WL 3604164, at *44 (transferor insolvent under Illinois UFTA "because its liabilities, including * * * contingent [capital gains tax] liability, exceeded its assets"); *United States v. Exec. Auto Haus, Inc.*, 234 F. Supp. 2d at 1257 (unknown tax claim taken into account in determining insolvency under Florida UFTA).

Little Salt's transfer of all of its cash to the Davis firm's trust account denuded it of assets unless we are to attach value (1) to the $467,721 that MidCoast lodged overnight with Little Salt or (2) to MidCoast's covenant pursuant to the agreement to cause the company to pay its 2003 estimated tax.

Whatever fair valuation one might attach to the $467,721 that MidCoast transferred to Little Salt, those funds were not, as discussed in the immediately preceding section of this report, received in consideration of Little Salt's transfer of the funds to MidCoast. Whether a transfer was fraudulent when made depends on conditions that existed when it was made. *See Boyer*, 587 F.3d at 795; *Nostalgia Network, Inc.*, 315 F.3d at 720. Because it was not received in consideration for the transfer, we will disregard the $467,721 that MidCoast lodged with Little Salt as an asset to be taken into account in determining whether Little Salt was made insolvent by the transfer.

Also, notwithstanding the lack of any expert (or other) valuation testimony, we find that MidCoast's covenant to

find that Little Salt was insolvent under the balance sheet test, we need not concern ourselves with the rebuttable presumption.

cause Little Salt to pay its 2003 estimated tax lacked any fair value. The term "fair valuation" is not defined in UFTA, but it is well known in bankruptcy law. *See, e.g.*, 11 U.S.C. sec. 101(32)(A) (2012) (defining "insolvent"). "[F]air valuation * * * means a fair market price that can be made available for payment of debts within a reasonable period of time, and 'fair market value' implies a willing seller and a willing buyer." *Am. Nat'l Bank & Trust Co. of Chicago v. Bone*, 333 F.2d 984, 986–987 (8th Cir. 1964). Assets that are not salable are not taken into account. *See, e.g.*, *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir. 1985). MidCoast did not, by the agreement, promise that it would pay Little Salt's combined estimated tax liability of $167,737. It promised only that it would "cause" the company to pay that liability to the extent, if any, that it was due "given the Company's post-Share Closing business activities". The trailing phrase adds nothing to what precedes it; i.e., that Little Salt would pay whatever were its 2003 tax bills (whether it had subsequent business activities that reduced those bills (perhaps to zero) or not). And MidCoast's promise to "cause" the company to pay its tax bills, without a concomitant promise to pay what the company lacked assets to pay, had little intrinsic value, whether to the company or to the shareholders. Moreover, that promise does not seem susceptible to liquidation in the market. Who would pay anything to the company or to the shareholders for it? How would it provide the company a ready source to pay its tax bills if it had insufficient cash to do so? *See Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980) ("Reduction in the face value of assets may be appropriate if those assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time." (discussing discounting of accounts receivable)). Because the promise appears to have little intrinsic value, and because whatever value it had would not be readily realizable in a market transaction, we find that MidCoast's promise to cause Little Salt to pay its 2003 tax bills had no value, determined under a fair valuation standard.

On August 7, 2003, Little Salt transferred $467,721 to the Davis firm's trust account, which left it with assets with nil fair value and a combined estimated tax liability of $167,737.

The transfer, therefore, caused it to become insolvent within the meaning of Neb. Rev. Stat. Ann. sec. 36–703(a).

v. *Conclusion*

Little Salt's transfer of $467,721 to the Davis firm's trust account was fraudulent with respect to respondent within the meaning of Neb. Rev. Stat. Ann. sec. 36–706(a).

c. *Neb. Rev. Stat. Ann. Sec. 36–705(a)(2)*

i. *Introduction*

Under UFTA, a transfer is constructively fraudulent with respect to a present or future claim if the transfer was made without the debtor's receiving "a reasonably equivalent value in exchange" and if either (1) the debtor's remaining assets "were unreasonably small" in relation to a present or anticipated business transaction or (2) the debtor "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Id.* sec. 36–705(a)(2). And while we have treated respondent's claim for Little Salt's unpaid 2003 tax as (1) arising before the transfer and (2) being fraudulent with respect to respondent pursuant to Neb. Rev. Stat. Ann. sec. 36–706(a), we believe that the transfer would be fraudulent with respect to respondent under Neb. Rev. Stat. Ann. sec. 36–705(a)(2) even if respondent's claim was viewed as arising when Little Salt's 2003 tax liability accrued (at the end of the year) or became due (December 15, 2003). For reasons we have already stated, Little Salt's transfer to the Davis firm's trust account was not made for reasonably equivalent value.

ii. *Unreasonably Small Assets*

Neb. Rev. Stat. Ann. sec. 36–705(a)(2) is different from Neb. Rev. Stat. Ann. sec. 36–706 in that it tests for *near* insolvency—for situations in which insolvency is all but certain in the near future—rather than for *current* insolvency. *See, e.g.*, *Boyer*, 587 F.3d at 794 (interpreting Indiana UFTA; test applies where debtor is left with "such meager assets that bankruptcy is a consequence both likely and foreseeable"). Neb. Rev. Stat. Ann. sec. 36–705(a)(2) contains two, disjunctive tests for near insolvency, and the debtor is nearly insolvent if either test is satisfied. *ASARCO LLC v. Ams.*

*Mining Corp.*, 396 B.R. 278, 396 (Bankr. S.D. Tex. 2008) (interpreting Delaware UFTA). Both tests are satisfied here.

The first test, Neb. Rev. Stat. Ann. sec. 36–705(a)(2)(i), is satisfied if the debtor was engaged in, or was about to engage in, a transaction for which its remaining assets were unreasonably small in relation to the transaction. At the time of the transfer, Little Salt had an estimated combined tax liability of $167,737 and could anticipate postyearend transactions with Federal and State tax authorities in which it would report its income and settle its 2003 tax bills. The unreasonably-small-assets test denotes a financial condition short of equitable insolvency (i.e., the inability of a debtor to pay its debts as they mature). *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989). It, instead, encompasses difficulties that are liable to lead to insolvency at some time in the future. *Dahar v. Jackson (In re Jackson)*, 459 F.3d 117, 124 (1st Cir. 2006) (interpreting New Hampshire UFTA); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992) (interpreting Pennsylvania UFTA). It calls for the court to examine the ability of the debtor to generate enough cash to pay its debts and to remain financially stable after the transfer. *Dahar*, 459 F.3d at 123; *Moody*, 971 F.2d at 1070. The standard to be applied is "reasonable foreseeability." *Moody*, 971 F.2d at 1073; *ASARCO*, 396 B.R. at 397. The determination requires an objective assessment of the company's financial projections. *ASARCO*, 396 B.R. at 397. A court should consider only those cash inflows that it is reasonable for the company to expect to receive, whether from new equity, cash from operations, or available credit. *Id.*

Little Salt's management at the time of the transfer (i.e., Mr. Joyce, its president, and Mr. Walters, its secretary and treasurer) had no knowledge of MidCoast's business expectations or its financial projections for the company, nor did they inquire of MidCoast as to those matters. Moreover, following the transfer, Little Salt had no operating assets, no employees, intangible assets of no discernable value, and no customers. The company's 2003 and 2004 Federal income tax returns are evidence that MidCoast's only plan for the company was a tax scheme to eliminate its taxable income. Those returns are clear evidence that, after the stock sale, the company did not engage in any business activity. They

show that, at each September 30 yearend, the company reported neither business assets, business liabilities, or other indicia of a business, such as cost of goods sold. The returns are also evidence of MidCoast's tax scheme to generate a phony bad debt deduction for the company by parking the cash MidCoast received from the company back with it for 24 hours before ostensibly lending it back to MidCoast, giving rise to a debt that MidCoast did not pay and that Little Salt erroneously claimed gave rise to a 2004 bad debt deduction and a net operating loss that the company carried back to, and deducted for, 2003. Little Salt's failure to engage in any post-stock-sale business activity and MidCoast's implementation of the tax scheme within minutes of receiving Little Salt's cash lead us to conclude that MidCoast's plans could not reasonably be expected to eliminate Little Salt's 2003 tax debts. Given those debts, if the transfer did not itself cause Little Salt to become insolvent, insolvency in the near future was a foregone conclusion. Consequently, the transfer was fraudulent with respect to respondent within the meaning of Neb. Rev. Stat. Ann. sec. 36–705(a)(2)(i).

iii. *Unable To Pay Debts*

The inability-to-pay test found in Neb. Rev. Stat. Ann. sec. 36–705(a)(2)(ii) can be satisfied either by a showing of intent, i.e., the debtor "intended to incur, or believed" that he would incur debts beyond his ability to pay as they came due, or by an objective showing; i.e., the debtor "reasonably should have believed" the same. The objective alternative measures whether a debtor, as a going concern, would reasonably have been able to pay its debts after making the challenged transfer. *See ASARCO*, 396 B.R. at 400. Little Salt was not a going concern at the time of the transfer. It would, therefore, have been unreasonable at that time to believe that the company could, from its business operations, satisfy its 2003 tax debt when that debt came due. Consequently, the transfer was fraudulent with respect to respondent within the meaning of Neb. Rev. Stat. Ann. sec. 36–705(a)(2)(ii).

d. *Remedies*

Having shown that Little Salt's transfer of all of its cash was fraudulent with respect to him, respondent may obtain "avoidance of the transfer * * * to the extent necessary to

satisfy * * * [his] claim". *See id.* sec. 36–708(a)(1). Moreover, because the transfer is voidable, respondent may recover judgment equal to the lesser of the value of the asset transferred or the amount necessary to satisfy his claim. *See id.* sec. 36–709(b). Here, that is the latter amount. The judgment may be entered against "the first transferee of the asset", "the person for whose benefit the transfer was made", or certain subsequent transferees. *See id.* Neb. Rev. Stat. Ann. sec. 36–708(b) is based on UFTA sec. 8 (1984), which is derived from section 550 of the Bankruptcy Code, 11 U.S.C. sec. 550 (2012). *See* UFTA sec. 8 cmt. (2), at 31 (1984). Transferees are those who receive the money or other property. Those who get a benefit because someone else received the money or property are persons for whose benefit the transfer was made. *See Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) (discussing 11 U.S.C. section 550(a)(1)). The paradigm "person for whose benefit the transfer was made" is a guarantor, who receives no money but is no longer exposed to the liability when the underlying obligation has been satisfied. *See id.* at 895. A person may also be a benefited person if he receives something valuable from the transferee. In *Gibbons v. Stemcor USA (In re B.S. Livingston & Co.)*, 186 B.R. 841 (D.N.J. 1995), the defendants were benefited when they sold the core of the debtor's business to a third party in exchange for lucrative positions in the new company.

The agreement contains MidCoast's promise to purchase from the shareholders all of their Little Salt shares for $358,826. MidCoast's fulfillment of that promise, however, was conditioned on Little Salt's prior transfer of $467,721 to the Davis firm's trust account for the benefit of MidCoast. MidCoast was, thus, a transferee (the first transferee) of $467,721 from Little Salt. (The Davis firm, MidCoast's agent, with no right to put the money to its own purposes, is disregarded. *See Bonded Fin. Servs.*, 838 F.2d at 893.) The shareholders undoubtedly benefited from Little Salt's transfer of the money to MidCoast because without it—as evidenced by the terms of the draft letter and the order of the actual cash transfers on August 7, 2003—Mr. Davis would not have released $358,826 from his firm's trust account to Mr. Morrow for disbursement to the shareholders. That amount was substantially in excess of the amount that

the shareholders would have received had they forgone the agreement with MidCoast, not caused Little Salt to transfer $467,721 to MidCoast, and, instead, liquidated the company. Had they done that, then, after paying (or arranging to pay) its combined estimated tax liability of $167,737 out of its cash balance of $467,721, Little Salt would have had left $299,984 to distribute to the shareholders in redemption of their shares. The shareholders benefited to the tune of $58,842, at the expense of the tax collectors, both Federal and State. They were, within the meaning of Neb. Rev. Stat. Ann. sec. 36–709(b)(1), “the person[s] for whose benefit the transfer was made”. *See, e.g.*, *Gibbons*, 186 B.R. 841. Because we make that finding, we need not determine whether MidCoast’s transfer of $358,826 to the shareholders was fraudulent as to respondent pursuant to Neb. Rev. Stat. Ann. sec. 36–705 or 36–706, entitling him to avoidance of the transfer under Neb. Rev. Stat. Ann. sec. 36–708, and a judgment against the shareholders, “first transferees”, under Neb. Rev. Stat. Ann. sec. 36–709(b). *See Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 611 (“[T]here were potentially *two* fraudulent transfers: one transfer from the company to the * * * [MidCoast equivalent], and another transfer from * * * [that entity] to the Trust [the stock seller][.]”); *Cullifer v. Commissioner*, T.C. Memo. 2014–208, at *63–*73 (“Transferee-of-Transferee Liability”).

The shareholders’ benefit, $58,842, is substantially less than the prescription in Neb. Rev. Stat. Ann. sec. 36–709 that respondent may recover judgment for “the amount necessary to satisfy * * * [his] claim”. We have found scant authority addressing the measure of recovery in beneficiary cases under Neb. Rev. Stat. Ann. sec. 36–709 or 11 U.S.C. sec. 550(a). The issue is discussed in Larry Chek & Vernon O. Teofan, “The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made Under Section 550(a): An Alternative to the Rorschach Test”, 4 J. Bankr. L. & Prac. 145, 163–172 (1995). The shareholders’ benefit was $58,842, and that is the amount for which we adjudge they are proportionally liable to respondent. *Cf.* Neb. Rev. Stat. Ann. sec 36–709(d)(3); *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2014–59, at *17 (under Massachusetts UFTA, “good-faith transferee is entitled to a judgment liability

reduction to the extent of the value it gave the debtor for the transfer").

### 3. *Nebraska Business Corporation Act*

Respondent predicates his claim under Neb. Rev. Stat. Ann. sec. 21–20,157(4) on our recasting the stock sale as a liquidation coupled with a fee paid to MidCoast. Since we decline to do that, we need not further consider respondent's argument for the application of Neb. Rev. Stat. Ann. sec. 21–20,157(4).

### 4. *Trust Fund Doctrine*

Respondent likewise predicates his claim under the common law trust fund doctrine on recasting the stock sale as a liquidation, and, since we do not do that, we need not further consider his trust fund claim.

### 5. *Section 6901*

Having determined that, pursuant to UFTA, respondent is entitled to a judgment against petitioners to satisfy a portion of his claim against Little Salt for its unpaid 2003 tax, we must finally determine whether petitioners are transferees within the meaning of section 6901. The purpose of the section 6901 is to allow the Commissioner summarily to enforce a transferee's liability established under State statutory provisions or otherwise. *See* H.R. Conf. Rept. No. 69–356, *supra* at 43, 1939–1 C.B. (Part 2) at 371. In *Stanko v. Commissioner*, 209 F.3d 1082 (8th Cir. 2000), *rev'g* T.C. Memo. 1996–530, the Court of Appeals determined that the appellant, a successor transferee, was liable to the Commissioner under the Nebraska Fraudulent Conveyance Act (replaced by UFTA) for the unpaid tax of the first transferee's wholly owned corporation. The court considered whether, as a successor transferee, appellant was a transferee within the meaning of section 6901. The court noted that the statute does not define the term "except to clarify that it includes a 'donee, heir, legatee, devisee, and distributee.'" *Id.* at 1085 n.2 (referencing section 6901(h)). It held: "[T]he Commissioner may proceed under § 6901 against *any* 'transferee' who is liable under state law for the debts of the transferor/taxpayer." *Id.*

In *Cole v. Commissioner*, T.C. Memo. 1960–278, *rev'd*, 297 F.2d 174 (8th Cir. 1961), we considered whether a wife was

liable as a transferee in the amount of $12,000 on account of her husband's payment of that amount to discharge an encumbrance upon her separately owned real property. The encumbrance secured an indebtedness on which both the husband and wife were indebted. At the time of the husband's payment, he was indebted to the Commissioner for unpaid taxes of more than $12,000. Applying Missouri law, we found that the husband's payment was fraudulent with respect to his creditors since it was without consideration and he was insolvent when he made it. We determined that the Commissioner could collect $12,000 from the wife pursuant to section 311(a) of the Internal Revenue Code of 1939 (the predecessor to section 6901). The question on appeal was whether, under Missouri law, the wife became a transferee of assets of her husband on account of his payment of their joint obligation and the discharge of the encumbrance on her property. The court held that she did not because, under Missouri law, the "settlement of an honest debt is not a fraudulent conveyance or assignment, even though the debtor is insolvent at the time and the transfer disables him from paying his other creditors." *Cole v. Commissioner*, 297 F.2d at 175. No question was raised as to whether, as only a beneficiary (and not the recipient) of the husband's payment of the debt, the wife could be a transferee within the meaning of section 311 of the Internal Revenue Code of 1939. We were reversed only because we erred in finding there to have been a fraud on the husband's creditors. The Court of Appeals concluded its opinion by stating: "Frances Cole was unquestionably the beneficiary of a preferential payment of a debt by her husband, but she was not a transferee of his assets *in fraud of his creditors*." *Id.* at 176 (emphasis added). The emphasized words would have been unnecessary had the court thought that Frances Cole was not a transferee within the meaning of section 311 of the Internal Revenue Code of 1939.

In *Shartle v. Commissioner*, T.C. Memo. 1988–354, a corporation indebted to the Internal Revenue Service for outstanding tax liabilities became insolvent upon its transfer of two parcels of real property to the former wife of its sole owner. The parcels were transferred by order of court in settlement of the former wife's property rights acquired during her marriage to the owner. We found the transfer to

be fraudulent with respect to the Commissioner pursuant to section 1336.04 of the Ohio Uniform Fraudulent Conveyance Act, Ohio Rev. Code Ann. sec. 1336.04 (Anderson 1961). The owner argued that the Commissioner could not collect from him pursuant to section 6901 because he did not receive any of the corporation's assets. We answered: "Although * * * [the owner] did not physically receive any of * * * [the corporation's] assets, said assets were transferred in satisfaction of his legal obligation to * * * [his former wife]. * * * [He] received the same benefit from * * * the assets as if they had been physically transferred to him." We treated him as a constructive recipient of the assets. We found that he was a transferee of the corporation's assets from whom the Commissioner could collect the corporation's tax liability pursuant to section 6901.

The three cited cases are evidence of the expansive reading that courts have given term "transferee" in applying section 6901. A person can be a transferee within the meaning of the section if he is an indirect transferee of property, *Stanko v. Commissioner*, 209 F.3d 1082, is a constructive recipient of property, *Shartle v. Commissioner*, T.C. Memo. 1988–354, or merely benefits in a substantial way from a transfer of property, *Cole v. Commissioner*, T.C. Memo. 1960–278. The determinative factor is liability to a creditor (the Commissioner) for the debt of another under a State fraudulent conveyance, transfer, or similar law. We have found that, pursuant to Neb. Rev. Stat. Ann. sec. 36–709(b)(1), the shareholders are collectively liable to respondent for $58,842 as "person[s] for whose benefit" Little Salt transferred $467,721 to MidCoast. They are, on that basis, transferees within the meaning of section 6901.

## IV. *Conclusion*

For the reasons stated, we sustain respondent's determination that petitioners are liable as transferees with respect to their respective shares of $58,842 of Little Salt's unpaid 2003 tax.

*Decisions will be entered under Rule 155.*